Percy JEFFREYS, Plaintiff,

v.

P.O. ROSSI and P.O. Montanez, Defendants.

No. 99 Civ.4059 SAS.

United States District Court, S.D. New York.

July 18, 2003.

J. Andrew Kent, Elise S. Zealand, New York City, for Plaintiff.

David A. Schwartz, Brett H. Klein, Assistant Corporation Counsel, Office of Corporation Counsel of the City of New York, New York City, for Defendants.

### *OPINION AND ORDER*

SCHEINDLIN, District Judge.

Percy Jeffreys, an inmate presently incarcerated at Wyoming Correctional Facil-

ity, brings this Section 1983 action against New York City police officers Emanuel Rossi and David Montanez. Jeffreys alleges that the officers violated his Fourth Amendment rights by using excessive force during his arrest on February 10, 1998, at Public School 40 ("P.S.40") in the Bronx.

Jeffreys now seeks to amend the Complaint for the third time to add as defendants an additional four police officers who were present at the time of his arrest— P.O. Jorge Gonzalez, P.O. Matthew Martell,[1] P.O. Angelo Tessitore, and Sergeant Tenel Bedford. Defendants have cross-moved to dismiss the action and, in the alternative, for summary judgment. Defendants have also moved under Rule 11 for sanctions against plaintiff and plaintiff's counsel for proceeding with the Second and Third Amended Complaints. Plaintiff has cross-moved for sanctions against defendants for bringing a baseless Rule 11 motion.[2]

For the reasons stated below, defendants' motion for summary judgment is granted. Plaintiff's motion to amend the Complaint is denied, as are the motion for sanctions against the attorneys.

### I. FACTS

#### A. Undisputed Facts

In February 1998, the 40th Precinct Burglary Unit ("the Unit")[3] identified Jef-

---

1. P.O. Martell is living in Florida, was not deposed in this case, and has never been contacted by the Office of Corporation Counsel of the City of New York ("Corp.Counsel") with regard to this lawsuit. *See* 1/13/03 Declaration of David A. Schwartz, counsel for defendants ("Schwartz Dec."), ¶¶ 14, 39. Consequently, plaintiff's counsel has advised defense counsel, by letter dated February 2003, that they will file a notice of dismissal with prejudice as to P.O. Martell in the event that this Court grants plaintiff's motion to amend the Complaint. *See* Plaintiff's Memorandum in Opposition to Defendants' Motion

for Rule 11 Sanctions ("Pl. R. 11 Mem.") at 9 n. 3.

2. This case was originally assigned to Judge Allen G. Schwartz. It was transferred to the undersigned in April 2003.

3. The Unit was comprised of Sergeant Bedford and officers Rossi, Montanez, Gonzalez, Tessitore, Martell, Cotter and Van Weddinger. *See* 12/20/02 Deposition of Angelo Tessitore ("Tessitore Dep.") at 33; 12/19/02 Deposition of Tinel Bedford ("Bedford Dep.") at 122–24;

freys, an illiterate, homeless man who was addicted to crack cocaine, as a suspect in a series of public school burglaries. *See* 12/17/02 Deposition of Emmanuel Rossi ("Rossi Dep.") at 47, 49; 12/18/02 Deposition of Jorge Gonzalez ("Gonzalez Dep.") at 77–80. On the night of February 9–10, 1998, the Unit met to discuss Jeffreys and the burglaries. *See* Rossi Dep. at 48; Gonzalez Dep. at 80–81. A "Wanted" poster containing a photograph of Jeffreys was distributed. *See* "Wanted Poster", Ex. S to 2/18/03 Affidavit of J. Andrew Kent, counsel for plaintiff ("Kent Aff."). Several officers were sent to stake-out an apartment where it was believed Jeffreys might be found. *See* Gonzalez Dep. at 82–83; Bedford Dep. at 239–41. Officers Gonzalez and Rossi were posted inside P.S. 40, a school the Unit believed Jeffreys might attempt to burglarize. *See* Rossi Dep. at 47; Gonzalez Dep. at 81–82.

As predicted, Jeffreys broke into P.S. 40 in the early morning hours of February 10, 1998. He made his way up to the third floor by means of an inside stairway. *See* 1/3/03 Deposition of Percy Jeffreys ("Jeffreys Dep.") at 220. He entered classroom 312 by breaking the window on the classroom door and reaching inside to turn the locked door knob. *See id.* at 234; 2/10/03 Affidavit of Percy Jeffreys ("Jeffreys Aff.") ¶ 3.

At approximately 2:15 a.m., Officers Gonzalez and Rossi spotted an intruder in or near the school courtyard. *See* 2/10/98 Entry in Memo Book of Officer Rossi ("Rossi Memo Book"), Ex. G to Kent Aff., at 000006. The officers called for back-up and waited until Sgt. Bedford and Officers Martell, Tessitore and Montanez joined

them. *See* Rossi Dep. at 114, 117. The six-man team then proceeded to the third floor of the school, the location from which noises had been heard. *See* Rossi Dep. at 124–26.

### B. Disputed Facts

#### 1. Plaintiff's Version

Jeffreys alleges that, while inside classroom 312, he heard a noise. *See* Jeffreys Aff. ¶ 4. Afraid there may have been police officers inside or outside the building, he opened a window to look out at the street and then hid under a desk. *See id.*; Jeffreys Dep. at 17–19. A person entered the classroom, stood over him at the desk, shined a flashlight in his eyes, and identified himself as a police officer. *See* Jeffreys Aff. ¶¶ 5–6; Jeffreys Dep. at 46–49. In response, Jeffreys turned around and raised his hands, expecting to be handcuffed and arrested. *See* Jeffreys Aff. ¶ 8; Jeffreys Dep. at 57, 62. Instead, the officer struck Jeffreys many times, including several blows to the head with a flashlight. *See* Jeffreys Dep. at 60, 67–68. Jeffreys fought back, but a blow from the officer caused Jeffreys to lose his breath and fall down. *Id.* at 69–70.

Other police officers then entered the room and began attacking Jeffreys, who was lying on the floor. *See id.* 71–72, 81. The officers struck Jeffreys a number of times on his chest, back, arms and head. *See id.* at 78, 81–82. Jeffreys attempted to fight back by punching, kicking, and biting them. *See id.* at 90, 92–93.[4] At some point during the beating, Jeffreys blacked out. *See* Jeffreys Aff. ¶ 11; Jeffreys Dep.

---

and 12/27/02 Deposition of David Montanez ("Montanez Dep.") at 28.

4. None of the police officers sustained any injuries on the night in question. *See* 1/10/03 Declaration of P.O. Emmanuel Rossi ("Rossi Dec."), Ex. F to Schwartz Dec., ¶ 2; 1/10/03

Declaration of P.O. David Montanez ("Montanez Dec."), Ex. G to Schwartz Dec., ¶ 2; 1/9/03 Declaration of P.O. Jorge Gonzalez ("Gonzalez Dec."), Ex. H to Schwartz Dec., ¶ 2; 1/9/03 Declaration of Sgt. Tinel Bedford ("Bedford Dec."), Ex. J to Schwartz Dec., ¶ 2.

at 84–85, 97. Then, one or more of the police officers must have pushed him out the window because Jeffreys did not jump or inadvertently fall. *See* Jeffreys Aff. ¶ 12; Jeffreys Dep. at 84–85, 97, 105, 122.

Jeffreys awoke on the pavement in front of the school. *See* Jeffreys Dep. at 105, 107–08. Although he was in excruciating pain, Jeffreys tried to escape from the officers. *See id.* at 110–17 (explaining that he "hurtled" himself over the fence and tried to crawl away); Jeffreys Aff. ¶¶ 13–14 (same). He did not get very far before he was handcuffed at 3:03 a.m. by members of the Unit. *See* Rossi Dep. at 239; Montanez Dep. at 125–26, 172–73; Gonzalez Dep. at 53–54, 58–59.

Within a few minutes of Jeffreys' arrest, an Emergency Medical Services ("EMS") ambulance and other police officers arrived. *See* Rossi Dep. at 171, 173–74. Before their arrival, one officer roughly wrested Jeffreys' hiking boot from his broken leg, even though Jeffreys was screaming, "My leg, my leg." Jeffreys Aff. ¶¶ 14–15; Jeffreys Dep. at 135. Jeffreys was taken to Lincoln Hospital for treatment of his injuries. *See* Jeffreys Aff. ¶¶ 16–17. Officer Van Weddinger, a member of the Unit, rode in the ambulance and subsequently guarded Jeffreys at the hospital. *See* Bedford Dep. at 122–23, 218; Gonzalez Dep. at 151.

Soon after he arrived at Lincoln Hospital, Jeffreys was given a strong pain killer and a sedating anti-anxiety medicine. *See* Jeffreys Aff. ¶ 18; Lincoln Hospital Medical Records ("Hospital Records"), Ex. M to Kent Aff., at JEF 00105–07, 00110, 00113, 00115. Jeffreys was under police watch the entire time he was in the hospital, which greatly terrified him. *See* Jeffreys Aff. ¶¶ 19–22; Hospital Records at JEF 00018, 00024, 00036. Jeffreys does not remember discussing how he came to be injured with any medical staff or anyone else. *See* Jeffreys Aff. ¶¶ 21–22; Jeffreys Dep. 152–53.

### 2. Defendants' Version

While investigating P.S. 40, Officer Rossi heard noise coming from Room 312. *See* Rossi Dep. at 134. Rossi shined his flashlight from the hallway through the broken window and observed an individual, who turned out to be Jeffreys, standing in the classroom carrying school property. *See id.* at 134–35. Rossi shouted, "Police, don't move." *See id.* He attempted to reach inside the broken window to open the door but was unable to reach the doorknob without cutting himself on the shards of glass.[5] *See id.* 138, 142–43. Jeffreys dropped the object he had in his hands and jumped out the window he had previously opened. *See id.* at 134–35, 140–41. Jeffreys fell to the ground, injuring his right leg. *See id.* at 161, 167. Upon seeing Jeffreys go out the window, Rossi shouted to his fellow officers, who were down the hallway, "He's going down the stairs!"[6] *See id.* at 156–57. None of the officers on the scene entered Room 312 while Jeffreys was in the building. *See* Rossi Dec. ¶ 1; Montanez Dec. ¶ 1; Gonzalez Dec. ¶ 1; Bedford Dec. ¶ 1.

Rossi, together with Officers Montanez, Gonzalez, Tessitore, Martell, and Bedford, ran downstairs and onto the street. They found Jeffreys lying in the street, attempting to crawl away. Jeffreys had no weap-

---

**5.** Officer Rossi initially testified that he could not reach the doorknob because his arm was too short. *See* Transcript of 2/10/98 GO–15 Interview of P.O. Rossi ("Rossi Interview"), Ex. H to Kent Aff., at 3.

**6.** Rossi testified that he did not fathom that Jeffreys would have jumped out the window and thought instead, when Jeffreys went towards the window, that he would climb down stairs to the ground. *See* Rossi Dep. at 156–57.

on and was handcuffed without incident. EMS was called to the scene and Jeffreys was stabilized. *See* Rossi Dep. at 160–66.

None of the officers recall seeing anyone remove Jeffreys' boots that night. *See* Rossi Dec. ¶ 4; Montanez Dec. ¶ 4; Gonzalez Dec. ¶ 4; Bedford Dec. ¶ 4. Rossi believes that the EMS technicians removed Jeffreys shoes in order to examine his injured leg. *See* Rossi Dec. ¶ 4. Rossi asked a technician for one of Jeffreys' boots for purposes of shoe-print identification and was given one. *See* Rossi Dep. at 175–77, 179.

### C. Summary of Evidence in the Record

#### 1. Police Investigation

On February 12, 1998, Sergeant Rene Moran from the New York City Police Department Internal Affairs Bureau Group 21 ("IAB") interviewed Jeffreys. According to Sgt. Moran, Jeffreys told him that when he discovered police officers were in the hallway looking for him, "he attempted to flee out of the classroom window, lost his footing and fell to the concrete below, injuring his right leg." 2/12/98 Investigating Officer's Report ("Moran Rpt."), Ex. R to Schwartz Dec. Jeffreys further stated that the first time he saw any police officers was when he

was on the ground outside the school. *See id.* Jeffreys did not mention any misconduct on the part of the officers involved. *See id.* At his deposition, however, Jeffreys could not recall a visit from Sgt. Moran. *See* Jeffreys Dep. at 238–39.[7]

#### 2. SPRINT Report

The officers' radio transmissions from P.S. 40 on the night of Jeffreys' arrest were contemporaneously recorded in a "SPRINT Report." *See* SPRINT Report Job No. T950, Ex. C to Kent Aff., at 000036–37. According to Jeffreys, the SPRINT Report shows a period of more than twenty minutes during which the officers appear to have broadcasted an initial arrest, a chase, another arrest, a request for assistance, and then a final arrest.[8] *See* Kent Aff. ¶ 11 (stating that the SPRINT Report demonstrates that the officers arrested someone at 2:42 a.m., were "chasing perp" at 2:48 a.m., had arrested someone again at 2:51 a.m., had "1 in custody" at 2:52 a.m., needed help at 2:53 a.m., and had made a final arrest at 3:03 a.m.[9]). Defendants dispute Jeffreys' reading of the SPRINT report, alleging that the notation "10–92c"—the official NYPD code for "crime arrest"—was added to the 2:42 a.m. and 2:51 a.m. entries at 8:15 a.m., when the sergeant was done processing

---

7. Kent has affirmed that he has "good reason" to doubt that Jeffreys made the statements attributed to him in that report, but declined to set forth those reasons in order to "safeguard[] privilege and trial strategy." Kent Aff. ¶ 100.

8. Jeffreys contends that the report contradicts the officers' testimony that only a few minutes elapsed from when Rossi first spotted Jeffreys on the third floor of P.S. 40 until Jeffreys was handcuffed outside of the school, *see* Kent Aff. ¶ 9 (citing Montanez Dep. at 55–56, 61–65, 68 and Rossi Dep. at 164), and is consistent with Jeffreys' account that his initial arrest in the classroom was followed by a beating, an unsuccessful attempt at self-defense, a second

surrender, and a final arrest on the pavement below the classroom, *see id.* ¶ 13. Jeffreys additionally contends that the thirty minute lag in reporting that someone had jumped out the window, *see* Sprint Report at 000037 (indicating for the first time at 3:33 a.m. that someone had jumped out a window), suggests that the officers used the time to "concoct and rehearse a fabricated story about what happened at the school that night," Kent Aff. ¶¶ 66–67.

9. The officers' testimony consistently reflects that a formal arrest took place at 3:03 a.m. *See* Gonzalez Dep. at 53–54, 58–59; Montanez Dep. at 125–26, 172–73; Rossi Dep. at 239.

the arrest, to indicate that the arrest was finalized. *See* 3/19/03 Affidavit of Frances Johnson, Police Communications Technician for NYPD ("Johnson Aff."), Ex. L to 3/21/03 Reply Declaration of Schwartz ("Schwartz Reply Dec."), ¶¶ 42–45; NYPD Radio Signals Code, Ex. D to Kent Aff., at 000065. According to defendants, these entries do no reflect arrests at those times. *See* Johnson Aff. ¶¶ 37, 44–45 (explaining that the "1 under" notation at 3:03 a.m. "reflects the first and only arrest made of a suspect on this job up to that time").

### 3. Medical Records

When Jeffreys was examined at the scene by EMS, he was found not to have lost consciousness and described as "alert and oriented." *See* Ambulance Call Report ("EMS Rpt."), Ex. K to Schwartz Dec. Jeffreys was sent to Lincoln Hospital, where he was examined by Ramnath Kapoor, M.D. *See* 12/13/02 Declaration of Ramnath Kapoor, M.D. ("Kapoor Dec."), Ex. L to Schwartz Dec. According to Dr. Kapoor, Jeffreys told him that he had "jumped three stories, landing on his heels." *Id.* ¶ 3; Hospital Records, Ex. A to Kapoor Dec., at JEF00007. *But see* Jeffreys Dep. at 179 (denying ever having made such statement); 2/13/03 Affidavit of Stephen Kardon, M.D., radiologist at Lincoln Hospital ("2/13/03 Kardon Aff."), ¶ 7 ("I do not think it possible that Mr. Jeffreys landed on his heels. Had he landed on his heels, he would have presented with a different constellation of injuries, namely, heel fractures and a compression fracture of the lumbar spine."). Dr. Kapoor also reports that Jeffreys denied any loss of consciousness. *See* Kapoor Dec. ¶ 4. Dr. Kampoor examined Jeffreys' head and found no head trauma. *See id.* ¶ 5; Hospital Records at JEF00007.

Later that day, Jeffreys was admitted to the surgical floor for the fracture to his right leg. Jeffreys reported to Nurse Jocelyn Labus, "I hurt myself." *See* Admission Assessment and Screening Record, Ex. M to Schwartz Dec., at JEF00161. The examination on the surgical floor revealed no lacerations or bleeding from the nose or ears. *See* Hospital Records, Ex. N to Schwartz Dec., at JEF00014.

A cat scan ("CT scan") of the head, abdomen, and pelvis, taken that day reveals that, in addition to the femur fracture, Jeffreys had a broken rib, "a *suspected* pulmonary contusion and extrapleural hematomas" (bruising and bleeding in the lung area), and "muscular asymmetry involving the rectus abdominus and lateral flank muscles," which "*may* reflect the presence of contusion, old injury or normal variation." 2/10/98 Report of CT Scan, Ex. A to 2/13/03 Kardon Aff. (emphasis added). There is also evidence in the medical records of an abrasion to Jeffreys' right arm and abdominal pain. *See* Hospital Records, Ex. M to Kent Aff., at JEF 00164; Multiple Trauma Sheet, Ex. L to Kent Aff., at JEF 00012; 2/17/98 Consultation Record, Ex. E to Schwartz Reply Dec.

On February 13, 2003, Dr. Kardon, the radiologist who issued the report regarding Jeffreys' CT scan, affirmed that Jeffreys had a "normal CT scan of the brain and skull," but that does not "rule out the possibility that Mr. Jeffreys had brain contusions." 2/13/03 Kardon Aff. ¶ 3. Dr. Kardon later acknowledged that his February 13 testimony was made in the absence of contemporaneous hospital and ambulance reports. *See* 3/3/03 Affidavit of Stephen Kardon, M.D. ("3/3/03 Kardon Aff."), Ex. M to Schwartz Reply Dec., ¶ 4. Upon further review, Dr. Kardon amended his opinion regarding the likelihood that Jeffreys suffered blows to his head. *See id.* ¶¶ 6, 15 (noting the absence of any evidence of external injury to Jeffreys' scalp or facial skin and opining that had Jeffreys "suffered a blow to the head with a hard round object such as a flashlight, he

would have presented with a contusion of the scalp, which would have been visible on his CT scan").

### 4. Corrections Records

After Jeffreys was arraigned at Lincoln Hospital on February 19, 1998, he was interviewed by risk screening personnel from the New York City Department of Corrections ("DOC"). Jeffreys provided a lot of information to the screener, including the name and address of an emergency contact person. *See* Arraignment and Classification Risk Screening Form ("DOC Form"), Ex. S to Schwartz Dec. In response to the question calling for Jeffreys' "physical condition as stated by inmate," the form indicates "jumped out 3rd floor window." *Id.* Jeffreys signed the screening form in Sections B and E. *See id.* Jeffreys' left index fingerprint appears in Section B next to his signature. *See id.* Jeffreys has acknowledged that all of the background information contained in the screening form is correct and that the signature is his own. *See* Jeffreys Dep. at 286–93.

Nine months later, Jeffreys told Dr. Charles Bendheim of Green Haven Correctional Facility ("Green Haven") that his injuries resulted from having been thrown out a window by the police. *See* Ambulatory Health Record, Ex. E to Kent Aff. (stating that Jeffreys was "wheelchair bound because of persistent pain associated [with] being thrown through a window by the police").[10]

### 5. Criminal Prosecution

While at Lincoln Hospital, Jeffreys signed a written confession to twelve burglaries, which contained no reference or claim of police mistreatment.[11] *See* 2/10/98 Handwritten Confession, Ex. E to

Schwartz Dec. There was no mention that Jeffreys was injured by the NYPD at Jeffrey's arraignment, guilty plea, or sentencing. *See* 2/19/98 Transcript of Hospital Arraignment before Judge Arthur Birnbaum, Ex. E to Schwartz Dec.; 5/4/98 Transcript of Plea before Justice John Byrne, Ex. P to Schwartz Dec.; 6/1/98 Transcript of Sentencing before Justice Byrne, Ex. Q to Schwartz Dec. According to Assistant Bronx District Attorney ("ADA") Linda R. Tacoma, at no time during the pendency of the criminal prosecution, did Jeffreys or his attorney, Frank Witte of Bronx County Legal Aid Society, claim that Jeffreys had suffered abuse at the hands of police officers. *See* 1/14/03 Declaration of ADA Tacoma, Ex. G to Schwartz Reply Dec., ¶ 7.

### 6. Identity of the Officers

Jeffreys cannot identify any of the individuals whom he alleges came into the classroom or describe them by race or physical description, including facial hair, weight, or clothing. *See* Jeffreys Dep. at 100–01. Nor can Jeffreys state how many police officers were in the classroom at any given time. *See id.* at 97–99.

Jeffreys has provided the following reasons for his inability to identify the particular officers: (1) the classroom was very dark, *see* Jeffreys Aff. ¶¶ 5, 10; Jeffreys Dep. at 26; (2) Jeffreys could not see the officer who entered the room first because he was hiding under a desk, *see* Jeffreys Dep. at 102; (3) flashlights were shined in his eyes, *see* Jeffreys Aff. ¶¶ 5, 10; Jeffreys Dep. at 46–47, 102–03; (4) Jeffreys had his back to the attacking officer, *see* Jeffreys Aff. ¶ 8; Jeffreys Dep. at 57, 62; · and (5) he was trying to protect himself

---

**10.** This was the first time Jeffreys publicly stated that he had been a victim of police misconduct.

**11.** The confession was written out for Jeffreys by Detective Hickey. *See* Jeffreys Aff. ¶ 23.

from the officers' blows, *see* Jeffreys Aff. ¶¶ 9–10; Jeffreys Dep. at 63, 72, 85.

### 7. Declarations of Jeffreys' Friends and Family

Jeffreys' aunt claims that Jeffreys called her from jail shortly after he was arrested and told her that he was thrown out a school window by police officers. *See* 2/13/03 Affidavit of Margaret Smith ("Smith Aff."), Ex. A to Kent Aff., ¶¶ 4, 6. In 1999 or 2000, Jeffreys allegedly told LaTonya Baskerville, the mother of his son, that he was attacked by police officers and thrown out a school window. *See* 2/3/03 Affidavit of Latonya Baskerville ("Baskerville Aff."), Ex. B to Kent Aff., ¶ 5.

## II. PROCEDURAL HISTORY

### A. Pro Se Complaint

In June 1999, Jeffreys filed a pro se complaint against the City of New York ("City"), the NYPD, P.O. Rossi and John Doe Police Officers alleging that he was physically abused in the course of his February 10, 1998 arrest and requesting pro bono counsel.[12] *See* Pro Se Complaint, Ex. B to 12/9/02 Declaration of J. Andrew Kent ("Kent Dec."). Jeffreys sought compensatory and punitive damages and a court order vacating his plea, subsequent conviction, and sentence. *See id.* at 3–5. On September 28, 2000, the Court dismissed Jeffreys' claims against the City and the NYPD with prejudice and the claims of excessive force against the police officers without prejudice and with leave to replead. *See Jeffreys v. City of New York*, No. 99 Civ. 4602, 2000 WL 1459845 (S.D.N.Y. Sept. 29, 2000). In addition, the Court denied Jeffreys' motion for appointment of counsel without prejudice and with

leave to renew. *See id* at *6 (concluding that "[t]he appointment of counsel may be warranted at a future stage of litigation in this case"). On October 24, 2000, Jeffreys filed a motion to replead, which the Court deemed to be an amended pro se complaint. *See* Amended Pro Se Complaint, Ex. D to Kent Dec.

### B. Assignment of Pro Bono Counsel

Jeffreys renewed his request for counsel on numerous occasions. *See, e.g.,* 3/25/00 Pro Se Motion in Response to Defendants' Copy of Amended Declaration of Service, Ex. I to Kent Dec., at 2; 4/5/00 Pro Se Affidavit in Opposition to Defendants' Judgment on the Pleadings [sic], Ex. J to Kent Dec., at 2; Amended Pro Se Complaint at 1. On June 4, 2001, the Court directed that pro bono counsel be appointed for Jeffreys. *See* 6/4/01 Order, Ex. R to 2/18/03 Affidavit of Elise Zealand ("Zealand Aff."). Shortly thereafter, Elise Zealand, the pro bono fellow at Sullivan & Cromwell ("S & C"), learned from the Southern District of New York's Pro Se Office that pro bono counsel was sought to represent Jeffreys. *See* Zealand Aff. ¶ 7. On July 16, 2001, before appearing as counsel for Jeffreys, Zealand traveled to Green Haven with two colleagues from S & C to interview Jeffreys. *See id.* ¶ 8. Zealand and her colleagues spent hours with Jeffreys that day and found him to be credible in his account of how he was injured in the course of his arrest. *See id.* ¶ 9. The following day, Zealand entered an appearance for Jeffreys. *See id.* ¶ 33.

### C. Counsel's Investigation of Jeffreys' Claims

On August 31, 2001, Zealand filed an Amended Complaint, which named and

---

**12.** Jeffreys was assisted by a jailhouse lawyer named Noah Simmons. *See* Undated Contract Between Jeffreys and Simmons, Ex. C to 7/15/03 Letter to Court from Brett H. Klein,

counsel for defendants (indicating that Simmons filed a section 1983 suit for Jeffreys in exchange for one-fifth of any jury award or settlement).

was served on defendants Rossi and Montanez. *See* Second Amended Complaint, Ex. A to Kent Dec. Before that filing, Zealand spent over fifty hours investigating plaintiff's claims, reviewing relevant documents—including Jeffreys' medical records, researching applicable case law, and conferring with other lawyers at S & C who had extensive civil rights litigation experience. *See* Zealand Aff. ¶ 11. She also spoke with plaintiff's court-appointed criminal defense lawyer and learned from plaintiff's aunt that plaintiff had recounted the events of February 10, 1998 to her shortly thereafter just as he described in his pro se complaint. *See id.*

In October 2001, James Andrew Kent began his tenure as S & C's twelfth pro bono fellow. *See* Kent Aff. ¶ 69. From that point forward, Kent and Zealand have been co-counsel on the *Jeffreys* case. *See* Zealand Aff. ¶ 35. In December 2001, Kent went to Wyoming Correctional Facility to meet with plaintiff. *See* Kent Aff. ¶ 73. Since then, Kent has spoken with Jeffreys several dozen times about the factual predicate for his claims. *See id.* ¶ 74. Kent has continually found Jeffreys to be credible and consistent in his recollection of the events of February 10, 1998. *See id.* ¶ 75.

Before proposing the Third Amended Complaint, Kent engaged in an extensive review of plaintiff's medical records. *See id.* ¶ 89. Kent found that the medical records showed several injuries or suspected injuries in addition to Jeffreys' fractured femur. *See id.* Kent believed that the injuries documented in the medical records were inconsistent with landing on one's heels after jumping from a third story window. From this belief, he formulated the theory that the statements about jumping from the window that were attributed to Jeffreys in the medical records

were either: (1) not made by Jeffreys; or (2) inaccurate for reasons that might have included fear and intimidation. *See* Pl. R. 11 Mem. at 6.

From the review of prison records and interviews of Jeffreys' friends and family members, Kent discovered that Jeffreys had made several prior consistent statements that supported his allegations. *See* Kent Aff. ¶ 94. In addition, Kent discovered that there are time lapses and transmissions in the SPRINT Report that are consistent with Jeffreys' account. *See id.* ¶¶ 6–7.

Kent also took steps to investigate Rossi's assertion that he could not open the door to classroom 312. Kent sent two co-workers to view, measure, and photograph the door, the results of which made Kent doubt defendants' "impossibility defense." *See id.* ¶¶ 40–42 (noting that the distance from the corner of the lowest windowpane to the door handle is less than thirteen inches). Kent also discovered inconsistencies in Rossi's story about the door. *Compare* Rossi Interview at 3 (indicating that the sole reason proffered by Rossi for why he could not open the classroom door was that his arm was too short) *with* Rossi Dep. at 138, 142–43 (giving two additional reasons why he could not open the door— *i.e.,* that he had a gun in his hand and was worried about the broken glass).[13]

Kent additionally discovered conflicting evidence about Montanez's whereabouts. *Compare* Montanez Dep. at 54–55, 89–90 (stating that Montanez was with Bedford and Martell in a different classroom from Jeffreys) *with* Tessitore Dep. at 91, 103, 107–8, 133 (stating that Montanez was in the hallway to the right of the stairwell near Rossi). Likewise, Gonzalez's testimony that he never saw Jeffreys inside the

---

**13.** Kent found it implausible that a police officer would stick his gun into a locked room where he knew a felony suspect was located. *See* Kent Aff. ¶ 47.

classroom, *see* Gonzalez Dep. at 123, 126–29, conflicts with Bedford's account that Gonzalez had "eyeballed" Jeffreys before Jeffreys went out the window, *see* Transcript of 2/10/98 GO–15 Interview of Sgt. Bedford, Ex. I to Kent Aff., at 8. *See also* 2/10/98 IAB Division Report, Ex. J to Kent Aff., at 000069 (stating that Gonzalez and Rossi "saw a perp. in a locked classroom").

On December 9, 2002, plaintiff's counsel filed a third amended complaint, which was revised on January 6, 2003. *See* Revised Third Amended Complaint, Ex. B to Schwartz Dec. The Third Amended Complaint amends only the names of the parties, not the alleged conduct of the parties.

### D. Rule 11 Motion

On December 16, 2002, defendants sent a detailed letter to plaintiff's counsel outlining defendants' anticipated Rule 11 motion and requesting that Jeffreys withdraw his motion to amend the Complaint and discontinue the action entirely. *See* 12/16/02 Letter to Kent from Schwartz ("12/16/02 Ltr."), Ex. W to Schwartz Dec. On January 6, 2003, plaintiff's counsel sent notice rejecting defendants' request that he withdraw the motion to amend the Amended Complaint. *See* 1/6/03 Letter to Judge Schwartz from Kent and Zealand, Ex. X to Schwartz Dec. On January 13, 2003, defendants moved for Rule 11 sanctions, in conjunction with their motion for summary judgment, and served plaintiff's counsel with those papers.[14]

## III. SUMMARY JUDGMENT[15]

### A. Legal Standard

Summary judgment is permissible "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "An issue of fact is genuine 'if the evidence is such that a jury could return a verdict for the nonmoving party.'" *Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002) (quoting *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A fact is material when "it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists. *See Marvel Characters, Inc. v. Simon,* 310 F.3d 280, 286 (2d Cir.2002) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. To do so, she "'must do more than simply show that there is some metaphysical doubt as to the material facts,'" *Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir.2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)), and she "'may not rely on conclusory allegations or

---

**14.** Defendants were given leave by the Court to file a joint motion for summary judgment and Rule 11 relief. *See* Reply Memorandum of Law in Support of Defendants' Motion for Rule 11 Sanctions ("Reply R. 11 Mem.") at 21.

**15.** Defendants move for judgment on the pleadings under Rule 12(c) and summary judgment under Rule 56. They rely, however,

on evidence outside the pleadings. Thus, the court will treat defendants' motion solely as one for summary judgment. *See* Fed.R.Civ.P. 12(c) ("If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56....").

unsubstantiated speculation.' " *Fujitsu Ltd. v. Federal Express Corp.,* 247 F.3d 423, 428 (2d Cir.2001) (quoting *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998)). *See also Gayle,* 313 F.3d at 682. Rather, the non-moving party must produce admissible evidence that supports her pleadings. *See First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 289–90, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968). In this regard, "[t]he 'mere existence of a scintilla of evidence' supporting the non-movant's case is also insufficient to defeat summary judgment." *Niagara Mohawk Power Corp. v. Jones Chem., Inc.,* 315 F.3d 171, 175 (2d Cir.2003) (quoting *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505).

In determining whether a genuine issue of material facts exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all inferences in that party's favor. *See Niagara Mohawk,* 315 F.3d at 175. Accordingly, the court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. Summary judgment is therefore inappropriate "if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Marvel,* 310 F.3d at 286 (citing *Pinto v. Allstate Ins. Co.,* 221 F.3d 394, 398 (2d Cir.2000)).

## B. Discussion

### 1. Personal Involvement of Defendants

Defendants argue that summary judgment is warranted because Jeffreys has failed to proffer any evidence to show that Rossi and Montanez were personally involved in the alleged deprivation of Jeffreys' rights. *See* Memorandum of Law in Support of Defendants' Motion to Dismiss the Complaint or in the Alternative for Summary Judgment and for Rule 11 Sanctions ("Def. SMJ Mem.") at 17–19 (noting that Jeffreys cannot identify or describe any of the individuals he claims beat him in the classroom on February 10, 1998). Defendants asserts that this lack of evidence precludes a rational jury from finding for Jeffreys. *See id.* at 19.

It is well-settled that " 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991)); *see also Blyden v. Mancusi,* 186 F.3d 252, 264 (2d Cir.1999). A police officer is personally involved in the use of excessive force if he either: (1) directly participates in an assault; or (2) was present during the assault, yet failed to intercede on behalf of the victim even though he had a reasonable opportunity to do so. *See Ricciuti v. New York City Transit Auth.,* 124 F.3d 123, 129 (2d Cir.1997); *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994). A plaintiff need not establish who, among a group of officers, directly participated in the attack and who failed to intervene. *See Skorupski v. County of Suffolk,* 652 F.Supp. 690, 694 (E.D.N.Y. 1987) (rejecting defendants' argument that they were entitled to summary judgment because plaintiff cannot specify which of the officers struck him and finding that all of the officers were potentially liable because they have an affirmative duty to intervene); *see also Fischl v. Armitage,* 128 F.3d 50, 57 (2d Cir.1997) (finding evidence that defendant was in the vicinity of the attack on plaintiff and did nothing to stop it sufficient to show defendant's personal involvement); *Miller v. Smith,* 220 F.3d 491, 495 (7th Cir.2000) (holding plaintiff's inability to identify which officer allegedly assaulted him did not preclude excessive force claims); *Smith v. Mensinger,* 293 F.3d 641, 650 (3d Cir.2002) (same).

There is undisputed evidence here that the defendants were either located inside classroom 312 or in the doorway or hallway outside of the classroom. *See* Rossi Dep. at 134–35, 137–39 (stating that he was standing at the classroom door when Jeffreys allegedly jumped out the window); Montanez Dep. at 58, 61 (stating that he was about six feet from Rossi when Rossi shouted "He's going down the stairs!"); Gonzalez Dep. at 119 (stating that he could see Rossi standing by the door to the classroom); Tessitore Dep. at 102 (stating that he was standing at the stairway close to classroom 312 at the time of the incident); Bedford Dep. at 177 (stating that he was in the doorway of a classroom across the hallway when Rossi yelled). Thus, Jeffreys' inability to identify which officers did what to him is not dispositive.

## 2. The Evidence of Excessive Force

Jeffreys cannot survive summary judgment, however, merely by demonstrating that the officers were present in the vicinity of the alleged attack. He must proffer *some* competent evidence that he was attacked by the officers. *See Christian Dior–New York, Inc. v. Koret, Inc.*, 792 F.2d 34, 38 (2d Cir.1986) (nonmovant must provide some basis to believe that his "version of relevant events is not fanciful"); *Dawes v. Coughlin*, 964 F.Supp. 652, 657 (S.D.N.Y.1997) (granting summary judgment on excessive force claim where there was no substantiation of plaintiff's claims that he was repeatedly kicked and punched by the police officers who subdued him), *aff'd*, 159 F.3d 1346 (2d Cir. 1998). Jeffreys' opposition to summary

judgment relies exclusively on affidavits of family members and friends, his own testimony, and inferences drawn from medical records, the SPRINT Report and the officers' testimony. None of this evidence is sufficient to meet plaintiff's burden.

### a. Affidavits of Family Members

The affidavits of Margaret Smith and Latonya Baskerville state only that they were told by Jeffreys that he was thrown out of a window of a school by the police.[16] Neither was a witness to the event. Thus, their statements are hearsay and as such, admissible only for the fact that Jeffreys told them about the incident—not for the truth of the matter asserted.

### b. Jeffreys' Testimony

█ Jeffreys' own testimony is so replete with inconsistencies and improbabilities that a reasonable jury could not find that excessive force was used against him. *First*, Jeffreys admitted on multiple occasions that he jumped out the window. *See* Kapoor Dec. ¶ 3 (stating that Jeffreys told him he had jumped three stories); Moran Rpt. (stating that Jeffreys admitted to having attempted to flee out the classroom window); DOC Form (indicating that Jeffreys described his physical condition as "jumped out 3rd floor window"). It was only nine months later, after Jeffreys had struck up a friendship with Simmons, a fellow inmate, that he told a corrections officer that he had been pushed out the window. *See* Ambulatory Health Record.[17]

*Second*, Jeffreys made no mention of the alleged beating to EMS workers, doctors,

16. Baskerville states that she was told first by Jeffreys' cousin, Candy Smith, and approximately one to two years later by Jeffreys himself. *See* Baskerville Aff. ¶¶ 3, 5.

17. Plaintiff's counsel contends that Jeffreys has provided a "plausible explanation" for the inconsistencies in his story about the window. *See Langman Fabrics v. Graff Califor-*

*niawear, Inc.*, 160 F.3d 106, 112–13 (2d Cir. 1998) ("If there is a plausible explanation for discrepancies in a party's testimony, the court considering a summary judgment motion should not disregard the later testimony because of an earlier account that was ambiguous, confusing, or simply incomplete"), *as amended by* 169 F.3d 782 (2d Cir.1998). While Jeffreys has posited a number of theo-

nurses, and the police when questioned about how his injuries were sustained. *See, e.g.,* Jeffreys Aff. ¶¶ 21–22 (stating that he did not tell any hospital staff about the beating); Moran Rpt. (stating that Jeffreys told Sgt. Moran that he saw the police officers for the first time when he was on the ground).[18]

*Third,* the medical records contain no evidence whatsoever of injury to Jeffreys' head. *See* Kapoor Dec. ¶ 4 (finding no head trauma); 2/13/03 Kardon Aff. ¶ 3 (reporting a normal CT scan of Jeffreys' brain and skull); 3/3/03 Kardon Aff. ¶ 7 (noting the absence of evidence on the hospital and ambulance records of external injury to Jeffreys' head). According to Dr. Kardon, any blow to the head, made with a hard object such as a flashlight, would have appeared on the CT scan and upon physical examination in the emergency room.[19] *See* 2/13/03 Kardon Aff. ¶ 15. In addition, the medical records indicate that Jeffreys never lost consciousness. *See* EMS Rpt. (finding no loss of consciousness); Kapoor Dec. ¶ 4 (stating that Jeffreys denied loss of consciousness); *see*

*also* 3/3/03 Kardon Aff. ¶ 10 (noting that Jeffreys' claim of unconsciousness is inconsistent with his statements given to emergency medical technicians and to the emergency department).

*Fourth,* the criminal record is devoid of any allegations of police misconduct. While I cannot rule out the possibility that Jeffreys told his defense counsel about the alleged beating,[20] I can think of no reason why, if he had, Witte would not have used that information during the course of the criminal proceedings.[21]

■ It is axiomatic that courts should not assess credibility on summary judgment. *See Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 619 (2d Cir.1996) (citing *United States v. Rem,* 38 F.3d 634, 644 (2d Cir.1994)); *see also Azrielli v. Cohen Law Offices,* 21 F.3d 512, 517 (2d Cir.1994) (acknowledging that credibility determinations are within the sole province of the jury). However, when evidence is so contradictory and fanciful that it cannot be believed by a reasonable person, it may be disregarded. *See Aziz Zarif Sha-*

---

ries to explain his alleged admissions in the hospital—ranging from denial to coercion to incapacity, *see* Jeffreys Aff. ¶¶ 19, 22—he has presented no consistent, coherent explanation that can be supported by evidence. Moreover, Jeffreys has offered no explanation for the statement in the DOC screening form. On the contrary, he has confirmed the accuracy of all other information in that form.

18. Jeffreys contends that the medical records corroborate his story because there is substantial evidence of physical injury. There is, however, no evidence that the "suspected" injuries detected on the CT scan were sustained the night of Jeffreys' arrest, let alone as a result of the beating. On the contrary, all of the injuries are consistent with Jeffreys' having fallen out of a third story window onto concrete and then having hauled himself over a six-foot high metal fence.

19. Plaintiff's counsel appear to have backed away from Jeffreys' claim of head trauma. In describing the beating their client allegedly

took at the hands of the police, plaintiff's counsel now characterizes the head trauma as having possibly occurred. *See* Kent Aff. ¶ 19 ("Jeffreys was 'hit all over' by the group of officers, and *perhaps* was hit on the head.") (emphasis added). During Jeffreys' deposition, however, he testified unequivocally that he was hit hard in the head more than once. *See* Jeffreys Dep. at 67.

20. Plaintiff's counsel have refused to divulge the substance of their conversations with Witte, asserting the attorney-client privilege.

21. Many public defender offices require that attorneys make a record of a client's claim of excessive force by the police at the arraignment and all subsequent court proceedings. *See* Schwartz Reply Dec. ¶ 12. The purpose is to preserve potential defenses to the charges and/or provide evidence for sentencing, in the case of a conviction. *See id.*

*bazz v. Pico,* 994 F.Supp. 460, 470 (S.D.N.Y.1998) (Sotomayor, J.) ("[W]hen the facts alleged are so contradictory that doubt is cast upon their plausibility, [the court] is authorized to 'pierce the veil of the complaint's factual allegations'" and "dispose of [the] improbable factual allegations and dismiss the claim") (quoting *Denton v. Hernandez,* 504 U.S. 25, 32, 112 S.Ct. 1728, 118 L.Ed.2d 340 (1992)), *aff'd,* 205 F.3d 1324 (2d Cir.2000).

■ The rationale underlying the rule that contradictory evidence may be disregarded is that a party cannot rely upon implausible testimony to create a triable issue of fact. *See, e.g., Trans–Orient Marine Corp. v. Star Trading & Marine, Inc.,* 925 F.2d 566, 572 (2d Cir.1991) (acknowledging that it is well-settled in this Circuit that self-serving affidavits that contradict prior sworn testimony will not defeat a motion for summary judgment) (citing *Mack v. United States,* 814 F.2d 120, 124 (2d Cir.1987)); *Radobenko v. Automated Equip. Corp.,* 520 F.2d 540, 544 (9th Cir. 1975) (holding that to allow the non-movant to create a genuine issue of material fact based upon self-serving, contradictory depositions and affidavits undermines "the utility of summary judgment as a procedure for screening out sham issues of fact") (quoting *Perma Research & Dev. Co. v. Singer Co.,* 410 F.2d 572, 578 (2d Cir. 1969)); *Schmidt v. Tremmel,* No. 93 Civ. 8588, 1995 WL 6250, at *3 (S.D.N.Y. Jan. 6, 1995) (finding no genuine issues of fact exist where a reasonable person would have to suspend disbelief to give credit to the allegations made in the complaint); *Price v. Worldvision Enters., Inc.,* 455 F.Supp. 252, 266 n. 25 (S.D.N.Y.1978) (acknowledging that "[i]ssues of credibility sufficient to defeat a motion for summary judgment are not created if the contradicting or impeaching evidence is too incredible to be believed by reasonable minds.") (internal quotation marks and citation omitted), *aff'd without opinion,* 603 F.2d 214 (2d Cir.1979).[22] This rule is consistent with Rule 11 jurisprudence, which provides that a court may sanction a party for proffering evidence for which there is no reasonable basis in fact by excluding the offending papers. *See infra* Part V.A. Because no reasonable person could believe Jeffreys' testimony, it cannot be considered in opposition to summary judgment.[23] Moreover, permitting Jeffreys to present

**22.** Plaintiff cites a number of cases in which summary judgment was denied despite the existence of contradictory testimony. In those cases, however, there was either some evidence to corroborate plaintiff's story, thereby providing a basis by which a jury could find for plaintiff, or the inconsistencies were not as stark. *See, e.g., Fischl v. Armitage,* 128 F.3d 50, 56 (2d Cir.1997) (stating that plaintiff's testimony that he was beaten was supported by photographs, hospital records, and a physician's opinion); *Smith v. Fields,* No. 95 Civ. 8374, 2002 WL 342620, at *6 (S.D.N.Y. Mar. 4, 2002) (plaintiff's allegations are not so contradictory as to cast doubt upon their plausibility).

**23.** Jeffreys attaches great significance to the fact that his prior inconsistent statements were not sworn. *See* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss for Summary Judgment ("Pl. SMJ Mem.") at 14 (citing *Thomas v. Roach,* 165 F.3d 137, 144 (2d Cir.1999)). In *Thomas,* the Second Circuit acknowledged the well-settled rule that a party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit that contradicts his prior sworn testimony and held that the rule applies "only where a plaintiff's affidavit contradicts former testimony during which he had been 'examined at length' on an issue." 165 F.3d at 144 (quoting *Mack,* 814 F.2d at 124). The rule to which *Thomas* refers is not dispositive here because the basis for striking Jeffreys' testimony goes far beyond the inconsistencies between his affidavit and his prior statements to hospital and medical personnel. Jeffreys' entire case, not just his affidavit, is contradicted by *all* of the evidence in the record, not just his prior inconsistent statements.

such incredulous testimony at trial would be a terrible waste of judicial resources and a fraud on the court.

### c. Inferences Drawn From Medical and Police Records

 Without Jeffreys' own testimony, all that remains in opposition to summary judgment are inferences that he argues may be drawn from the medical evidence, the SPRINT report, and the officers' testimony. Jeffreys argues, for example, that the radio transmissions in the SPRINT Report demonstrate that the arrest took approximately twenty minutes, which contradicts the officers' account and corroborates his story of a beating. However, defendants' expert on police communications has discounted this lay reading of the report and interpreted the transmissions in a manner consistent with defendants' account that the pursuit of Jeffreys took approximately four minutes. *See* Johnson Aff. ¶¶ 12, 16 (stating that at 2:48 a.m., the officers began chasing the perpetrator and that by 2:52 a.m., the perpetrator was in custody). In any event, even if the court were to adopt plaintiff's reading of the SPRINT Report, the inferences drawn therefrom must be reasonable.[24] *See H.L.*

*Hayden Co. of New York, Inc. v. Siemens Med. Sys., Inc.,* 879 F.2d 1005, 1012 (2d Cir.1989) ("[O]nly *reasonable* inferences can be drawn from the evidence in favor of the nonmoving party.") (emphasis in original). The requested inference is simply *not* reasonable. Moreover, Jeffreys cannot prove his direct case solely by poking holes in the officers' testimony. *See Anderson,* 477 U.S. at 257, 106 S.Ct. 2505 (acknowledging that "discredited testimony" is generally insufficient to defeat summary judgment; some affirmative evidence is needed) (quoting *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 512, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984)); *Dowd v. Internal Revenue Serv.,* 776 F.2d 1083, 1084 (2d Cir.1985) (holding that a party cannot rely exclusively on negative inferences to present a genuine issue of material fact). Because Jeffreys has no competent, affirmative evidence to support his allegations, he cannot proceed to trial. Summary judgment is therefore granted.[25]

## IV. AMENDMENT OF THE COMPLAINT

 Jeffreys seeks to amend his complaint by replacing John Doe defendants

---

24. Jeffreys additionally argues that the court should draw adverse inferences against defendants because they destroyed thirteen photographs of P.S. 40 and classroom 312 that were taken by the Burglary Unit on February 10, 1998 and because Officer Tessitore failed to maintain his memo book entries from the date of the incident. *See* Pl. SMJ Mem. at 14–16. A party's failure to preserve relevant evidence can support an inference that the evidence would have been unfavorable to the party responsible for its destruction. *See Reilly v. Natwest Mkts. Group,* 181 F.3d 253, 267–68 (2d Cir.1999). The party seeking to draw the negative inference must show that the evidence is relevant to a contested issue, that the party with control over the evidence had an obligation to preserve it at the time it was destroyed, and that the evidence was intentionally destroyed. *See Kronisch v. Unit-*

*ed States,* 150 F.3d 112, 126–27 (2d Cir.1998) (citations omitted). There is no evidence here that defendants intentionally destroyed the evidence. Even if I were to assume, for purposes of summary judgment, that defendants intentionally destroyed the evidence, "the destruction of evidence, standing alone, is [not] enough to allow a party who has produced no evidence—or utterly inadequate evidence—in support of a given claim to survive summary judgment on that claim." *Kronisch,* 150 F.3d at 128 (citation omitted).

25. Defendants also argue that the complaint against P.O. Montanez, which was filed on August 31, 2001, is time-barred because it was brought 202 days after the statute of limitations had expired. *See* Def. SMJ Mem. at 16. Because I am granting summary judgment, there is no need to consider this issue.

with named officers. *See McNeil v. United States*, 508 U.S. 106, 112, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993). It is well-established that "leave to amend may be denied when the amendment would be futile." *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). An amendment is futile if it would not survive a motion to dismiss. *See Kane v. Krebser*, 44 F.Supp.2d 542, 545 (S.D.N.Y.1999); *see generally Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir.1993) ("Where it appears that granting leave to amend is unlikely to be productive ... it is not an abuse of discretion to deny leave to amend."). Because there is no triable issue of fact in this case, amendment would be futile. Plaintiff's motion to amend the Complaint is therefore denied.

## V. RULE 11 SANCTIONS

### A. Legal Standard

Rule 11(b) provides in relevant part:

By presenting to the court ... a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances ... the claims, defenses, and other legal contentions therein are warranted by existing law ... [and that] the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a

reasonable opportunity for further investigation or discovery.

Fed.R.Civ.P. 11(b). If, after notice and a reasonable opportunity to respond, the court determines that the standards set forth in section (b) have been violated, the court may impose sanctions upon the attorneys, law firms, or parties. *See* Fed. R.Civ.P. 11(c).[26]

■ A pleading, motion or other paper violates Rule 11 either when it " 'has been interposed for any improper purpose, or where, after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well-grounded in fact and warranted by existing law....' " *W.K. Webster & Co. v. American President Lines, Ltd.*, 32 F.3d 665, 670 (2d Cir.1994) (quoting *Eastway*, 762 F.2d at 254). Sanctions should only be imposed "where it is patently clear that a claim has absolutely no chance of success." *Healey v. Chelsea Res., Ltd.*, 947 F.2d 611, 626 (2d Cir.1991) (quoting *Stern v. Leucadia Nat'l Corp.*, 844 F.2d 997, 1005 (2d Cir.1988) (internal quotation marks and citation omitted)).

■ In determining whether a Rule 11 violation has occurred, the court should use an objective standard of reasonableness. *See MacDraw, Inc. v. CIT Group Equip. Fin., Inc.*, 73 F.3d 1253, 1257–58 (2d Cir.1992) (citing *Business Guides, Inc. v. Chromatic Communications Enters., Inc.*, 498 U.S. 533, 548, 111 S.Ct. 922, 112 L.Ed.2d 1140 (1991)). Whether the attorney's conduct was reasonable should be

**26.** The type of sanction to be imposed is within the discretion of the district court. *See Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 254 n. 7 (2d Cir.1985); *see also* Rule 11 Advisory Committee Note ("The court ... retains the necessary flexibility to deal appropriately with violations of the Rule. It has discretion to tailor sanctions to the particular facts of the case...."). Among the types of sanctions that the court may choose are: a fine or penalty paid to the court, an award of

reasonable expenses and attorneys' fees incurred as a result of the misconduct, an order precluding the introduction of certain evidence, and dismissal of the action. *See* Gregory P. Joseph, *Sanctions: The Federal Law of Litigation Abuse* 259–260 (3d ed.2000); *see also Murray v. Dominick Corp. of Canada, Ltd.*, 117 F.R.D. 512, 515–16 (S.D.N.Y.1987) (acknowledging that, like Rule 37, Rule 11 provides for the sanction of dismissal of a pleading, motion, or other paper).

determined without the benefit of hindsight, based on what was objectively reasonable to believe at the time the pleading, motion or other paper was submitted. *See Kamen v. AT & T*, 791 F.2d 1006, 1011–12 (2d Cir.1986). "Thus, what constitutes a reasonable inquiry may depend on such factors as how much time for investigation was available to the signer; whether he had to rely on a client for information as to the facts underlying the pleading, motion or other paper; whether the pleading, motion or other paper was based on a plausible view of the law; or whether he depended on forwarding counsel or another member of the bar." *Id.* at 1012. In addition, attorneys are entitled to rely on the objectively reasonable representations of their clients. *See Hadges v. Yonkers Racing Corp.*, 48 F.3d 1320, 1329–30 (2d Cir.1995). All doubts must be resolved in favor of the signer of the pleading. *See Rodick v. City of Schenectady*, 1 F.3d 1341, 1350 (2d Cir.1993) (citing *Associated Indem. Corp. v. Fairchild Indus.*, 961 F.2d 32, 34 (2d Cir.1992) (internal quotation marks and citations omitted)).

 The Supreme Court has cautioned that Rule 11 "must be read in light of concerns that it will ... chill vigorous advocacy." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393, 110 S.Ct. 2447,

110 L.Ed.2d 359 (1990); *see also MacDraw, Inc.*, 73 F.3d at 1259. "[J]udges should always reflect seriously upon the nuances of the particular case, and the implications the case has on the nature of the legal representation, before imposing sanctions." *Thompson v. Duke*, 940 F.2d 192, 195 (7th Cir.1991).

### B. Discussion

### 1. Counsel's Investigation Was Reasonable

 Defendants argue that Rule 11 sanctions are appropriate here because: (1) the medical evidence conclusively establishes an absence of injuries that would have been sustained if plaintiff had been beaten in the course of his arrest; and (2) the law governing defendants' "personal involvement" in civil rights violations precludes liability where plaintiff cannot attest to each defendant's role. Jeffreys contends that the medical and other evidence corroborates his sworn account of physical abuse and that the applicable law expressly defines a defendant's "personal involvement" to encompass wrongful action and inaction, as supported by the evidence in this case.[27]

Although the evidence in support of Jeffreys' claim is extremely weak, there

---

**27.** Jeffreys also contends that sanctions should be denied outright because defendants: (1) filed their Rule 11 motion with their summary judgment motion; and (2) failed to serve their motion on plaintiff's counsel before it was served on the Court. Defendants have complied with the procedural requirements set forth in Rule 11.

*First,* although the Federal Rules require that motions brought under Rule 11 be filed separately from other motions or requests, *see* Fed.R.Civ.P. 11(c)(1)(A), the Court (per Schwartz, J.) expressly granted defendants leave to proceed with a joint motion. Defendants should not be penalized for complying with the Court's order.

*Second,* although defendants did not serve their Rule 11 motion on plaintiff twenty-one days prior to filing it with the Court, as re-

quired by Rule 11(c)(1)(A), defendants' noncompliance was merely technical. Defendants served plaintiff on September 16, 2002, with a detailed letter outlining their anticipated motion and attaching evidentiary support. The letter was sent to plaintiff more than twenty-one days before defendants filed their formal motion. *See* 12/16/02 Ltr. ("Should plaintiff fail to withdraw the pending motion and the action within twenty-one days from today, defendants will thereafter move under Rule 11 for all available sanctions...."). Thus, plaintiff was provided with sufficient notice of defendants' intent to move for sanctions and an opportunity to withdraw the offending papers. *See Nisenbaum v. Milwaukee County*, 333 F.3d 804, 808 (7th Cir.2003) (finding that defendants' "letter" or "demand" rather than "motion" constituted substantial compliance with Rule 11(c)(1)(A) be-

was a reasonable basis for plaintiff's counsel to have believed Jeffreys' allegations were grounded in fact when they filed their motion to amend the Complaint for the third time.[28] Before proposing the Third Amended Complaint, plaintiff's counsel conducted numerous interviews with their client and found him to be consistent and credible in his account. In addition, plaintiff's counsel engaged in an extensive investigation of Jeffreys' claims, including review of medical and documentary evidence, non-client interviews, and a site inspection of the scene.[29] Kent discovered evidence that he believed corroborated plaintiff's account—*i.e.*, the SPRINT report, prior consistent statements by plaintiff, and inconsistencies in defendants' story. Contrary to defense counsel's repeated assertion that Jeffreys sustained *no* injuries to any part of his body other than his right leg, Kent found evidence of other injuries in the medical records that *could have* resulted from a beating or a fall.[30] Kent also reasonably concluded that Jeffreys did not say he landed on his heels.

■ The absence of evidence of head trauma in the medical records does not conclusively rule out the possibility that Jeffreys was hit in the head nor compel plaintiff's counsel to disbelieve their client. On the contrary, plaintiff's counsel is entitled to rely on the representations of their client, without having to assess his credibility; "credibility is solely within the province of the finder of fact." *Healey v. Chelsea Res., Ltd.*, 947 F.2d 611, 626 (2d Cir.1991) (holding that a lawyer cannot be sanctioned for his client's total lack of credibility so long as his client's testimony is not incredible as a matter of law at the time the lawyer accepted it as true);[31] *see*

cause defendants "alerted [plaintiff] to the problem and gave him more than 21 days to desist"). *But see Lancaster v. Zufle,* 170 F.R.D. 7 (S.D.N.Y.1996) (finding letter requesting that lawsuit be withdrawn did not comply with "safe harbor" provisions of Rule 11 because letter did not indicate Rule 11 sanctions were sought and therefore failed to provide adequate notice). Defendants are therefore entitled to a decision on the merits of their request for sanctions under Rule 11.

28. Under Rule 11, a lawyer's conduct is assessed "as of the time the pleading or other paper is signed." *Oliveri v. Thompson,* 803 F.2d 1265, 1274 (2d Cir.1986).

29. The fact that there are other means of investigation plaintiff's counsel could have employed, such as consulting with the treating doctor or nurse or deposing Sgt. Moran, *see* Reply R. 11 Mem. at 9–10, does not mean that they failed to meet their Rule 11 obligations. *See Televideo Systems, Inc. v. Mayer,* 139 F.R.D. 42, 47 (S.D.N.Y.1991) (acknowledging that a "reasonable inquiry" into the factual sufficiency of a claim "need not be exhaustive, merely reasonable") (citation omitted); *Orenstein v. Compusamp, Inc., et al.,* No. 73 Civ. 5012, 1974 WL 455, at *3

(S.D.N.Y. Oct. 15, 1974) (finding investigation sufficient under Rule 11 "even though additional research by plaintiff's attorneys might have accelerated the present litigation and reduced the wrath of defendants' attorneys").

30. Defendants accuse plaintiff of "attempt[ing] to manipulate [Dr. Kardon's] statements by refusing to provide complete information to him and by failing to ask those questions ... that may have contradicted their client's contentions." Reply R. 11 Mem. at 3. While the Court agrees that counsels' investigation would have been more complete had they sought Dr. Kardon's opinion on all of the medical evidence in this case, plaintiff's counsel did not conduct themselves unethically in obtaining Dr. Kardon's affidavit. They asked Dr. Kardon only to explain the report he rendered on Jeffreys' CT scan, and offer his affidavit solely for that purpose.

31. Although plaintiff's counsel cannot be sanctioned for their client's lack of credibility, Jeffreys himself can be sanctioned. *See Healey,* 947 F.2d at 626 (holding that a court's assessment of a client's credibility may provide a basis for an award of sanctions against the client himself). Because Jeffreys knew there was no evidentiary support for his ex-

*also Big Rapids Mall Associates*, 98 F.3d 926, 932 (6th Cir.1996) (holding that, absent some further evidence of attorney fault, a lawyer cannot be sanctioned because a judge believes his client lacks credibility). In light of the significant time spent and avenues explored, plaintiff's counsel conducted a reasonable investigation and had a reasonable factual basis [32] when they filed the Third Amended Complaint [33] to believe that Jeffreys' claim had merit. Sanctions are therefore not warranted at this time.[34]

### 2. Continuing to Press Plaintiff's Claim Would Be Sanctionable

In the course of litigating these three motions, however, new evidence has come to light that renders Jeffreys' story implausible as a matter of law. For example, Dr. Kardon has amended his opinion on the medical records and Johnson has disproved plaintiff's counsel's reading of the SPRINT Report. Thus, if plaintiff's counsel were to continue to litigate this case, they and their client would be at serious risk of sanctions.[35] *See Calloway v. Mar-*

*vel Entertainment Group*, 854 F.2d 1452, 1469–70 (2d Cir.1988) (holding that continued prosecution of a case where it would appear to a reasonable attorney that the factual allegations cannot be supported can subject an attorney to sanctions), *rev'd. in part on other grounds*, 493 U.S. 120, 110 S.Ct. 456, 107 L.Ed.2d 438 (1989); *Ford v. Temple Hosp.*, 790 F.2d 342, 350 (3d Cir. 1986) (holding that sanctions may be imposed for improper "continuance of the litigation," even if commencement and the initial pursuit of those claims was not sanctionable conduct); Joseph, *Sanctions* 438 (acknowledging that litigants and their lawyers are under a continuing duty to correct or withdraw litigation positions based on matters that subsequently come to their attention). That risk, however, is obviated by the grant of summary judgment to defendants.[36]

## VI. CONCLUSION

For the reasons stated above, defendants' motion for summary judgment is granted and plaintiff's motion to amend the Complaint is denied. No sanctions

---

cessive force claim when he filed this action, his conduct is sanctionable. As a sanction for his misrepresentations, his spurious testimony is excluded. *See supra* Part III.B.2.

**32.** Plaintiff's counsel also formed a reasonable belief that Jeffreys' claim was warranted by existing law because plaintiff is not required to establish which officers directly participated in the attack and which failed to intervene. *See supra* Part III.B.

**33.** Because I find that there was a reasonable basis for the Third Amended Complaint, there is no need to consider the Second Amended Complaint, which was filed more than one year earlier.

**34.** Plaintiff's counsel requests reasonable fees and costs for defending the Rule 11 motion. This Court has discretion under Rule 11 to impose costs against defense counsel as a sanction for bringing a frivolous motion. *See Wilder v. GL Bus Lines*, 258 F.3d 126, 130 (2d

Cir.2001). Although I am denying defendants' motion for sanctions against the attorneys, the motion was not frivolous. Thus, plaintiff's request is denied.

**35.** The implications of imposing sanctions on highly-credentialed, young lawyers who undertook the pro bono representation of an unpopular client to assist the Court would be profound. There is no doubt that it would "chill" pro bono representation, which would mean that even fewer poor, disenfranchised members of our society would get the legal representation they so desperately need.

**36.** In any event, after oral argument, plaintiff's counsel applied, with the consent of their client, to be relieved from their appointment to represent Jeffreys. *See* 7/10/03 Letter to Court from Kent and Zealand ("7/10/03 Ltr."). The Court has this day granted counsels' application. *See* 7/18/03 Endorsement on Application to Be Relieved From Appointment As Counsel (attached to "7/10/03 Ltr.").

against the attorneys are warranted. The Clerk of the Court is directed to close all pending motions and this case.

SO ORDERED.