**KOAM PRODUCE, INC., Petitioner,**

v.

**DIMARE HOMESTEAD, INC., Respondent.**

**No. 01 CIV. 2494(LLS).**

United States District Court, S.D. New York.

July 26, 2002.

Gentile & Dickler (Paul T. Gentile, Keven P. Claffey, of counsel), New York City, for Petitioner.

Rynn & Janowsky (Bart M. Botta, of counsel), Newport Beach, CA, for Respondent.

## OPINION and ORDER

STANTON, District Judge.

This is an appeal by Koam Produce, Inc. ("Koam") from a November 16, 2000 reparation award in the amount of $4,800 plus interest and costs, rendered by a Judicial Officer of the United States Department of Agriculture ("USDA") against Koam and in favor of DiMare Homestead, Inc. ("DiMare").

Under Section 499g(c) of the Perishable Agricultural Commodities Act ("PACA"), 7 U.S.C. § 499a *et. seq.*, such an appeal is tried *de novo* in the federal district court, in the same manner as other civil damage suits, except that the factual findings in the reparation order are prima facie evidence of the facts found.

A non-jury trial on stipulated facts and exhibits was held before me on May 20, 2002.

### Background

Sales of fresh fruits and vegetables in interstate commerce are regulated by the USDA pursuant to PACA. The USDA, through the Agricultural Marketing Service ("AMS"), employs inspectors who independently evaluate the quality and condition of produce. *See* 7 U.S.C. § 499n. The USDA summarizes the inspection process as follows:

USDA fruit and vegetable inspection is a voluntary, fee-for-service program, administered by AMS since 1928. The objective of the inspection program is to facilitate trade by providing buyers and sellers of fresh fruits and vegetables with impartial and accurate information about the quality (inherent, non-progressive characteristics, such as size or shape) and condition (defects of a progressive nature, such as decay or ripeness) of shipments of fresh produce based on well-known, published USDA standards.

.     .     .     .     .

The inspection program for fresh fruits and vegetables is available at shipping points located in growing areas and at wholesale markets and other points where large volumes of fresh produce are received. At shipping points, inspection is requested by growers, processors or packers for quality assurance, to satisfy the requirements of state or federal marketing orders, or to verify compliance with specifications on fresh produce for processing. At wholesale markets, such as Hunts Point, and other receiving points, fresh produce inspection is most often requested to resolve a dispute between a buyer and seller about the quality or condition of delivered produce. In either case, the inspection program enables financially interested parties to verify the extent to which shipments meet expectations.

At wholesale markets, either the seller or a prospective buyer can request AMS inspection. Although shippers at times initiate the request, most often it is buyers that ask for inspections, generally when they suspect that the shipment does not meet contract requirements and are seeking an adjustment in the price....

"Report and Analysis of the Hunts Point Bribery Incident," Koam Ex. B, at 1–2 ("Report").

On October 27, 1999, as part of an investigation known as "Operation Forbidden Fruit" covering the years 1996 to 1999, twenty-one people were arrested for bribery at the Hunts Point Wholesale Produce Market in the Bronx: eight USDA inspectors and thirteen owners and employees of wholesale companies doing business at Hunts Point. Another inspector and two wholesalers from a fourteenth company had previously been arrested, and cooperated with the government. "The AMS inspectors were charged with accepting cash bribes in exchange for reducing the grade of the produce they inspected, which then allowed the Hunts Point companies to pay some amount less than the invoice price to their suppliers." *Id.*, at 1. All of the inspectors and most of the employees pleaded guilty. These included Marvin Friedman, an employee of Koam, who pleaded guilty to ten counts of bribing inspectors, and the three inspectors who

inspected the five shipments from DiMare to Koam which are involved in this case.

As part of its response to the Hunts Point bribery scandal, the USDA sent letters to 17,000 members of the produce industry informing them of indictments in connection with the scandal, the department's plans to improve inspections, and a process by which injured parties could file PACA reparations claims for damages.

DiMare filed its claim, to the effect that it had paid $4,800 to Koam in unjustified price reductions based on fraudulent certificates issued by bribed inspectors. The Judicial Officer ruled in DiMare's favor, holding as a matter of law that Koam's negotiation of the adjustments, without disclosure of its involvement of the bribery of the federal inspectors, constituted a misrepresentation basic to the adjustment process, rendering the adjustments voidable because of misrepresentation and mistake. He held that because Koam could not rely on the tainted inspection certificates, or affidavits of its employees, it could not carry its burden of showing that the quality of the tomatoes DiMare had shipped to it was inferior. Accordingly, he held that the full contract price was payable by Koam, and set aside the $4,800 adjustments.

On Koam's appeal to this court, the parties stipulated the facts as follows:

## UNCONTESTED FACTS

1. DiMare was the complainant in a reparation proceeding brought under the Perishable Agricultural Commodities Act of 1930, as amended ("PACA"), 7 U.S.C. § 499a *et seq.*, entitled DiMare Homestead, Inc. v. Koam Produce, Inc., ("PACA Docket R–00–159, United States Department of Agriculture, Before the Secretary of Agriculture") ("Reparation Proceeding").

2. Koam was the respondent in the reparation proceeding.

3. DiMare instituted the reparation proceeding by filing an informal complaint against Koam on December 1, 1999 in which DiMare sought reparations in the amount of $4,800.00 in connection with DiMare's sale of tomatoes to Koam.

4. Thereafter, on April 7, 2000, DiMare filed a formal complaint against Koam seeking the same relief that DiMare requested in its informal complaint.

5. The amount of the claim against Koam did not exceed $30,000.00, and therefore the reparation proceeding was conducted under the documentary procedure provided in the Rules of Practice (7 C.F.R. § 47.20).

6. By decision and order dated November 16, 2000 (the "Reparation Order"), Judicial Officer, William G. Jenson, acting through the office of the Secretary of Agriculture (the "Secretary") granted DiMare the relief it requested in its complaint and ordered Koam to pay reparations in the sum of $4,800.00 plus interest and costs.

7. On or about January 10, 2001, Koam filed a petition for reconsideration of the Reparation Order with the Secretary.

8. On or about March 1, 2001, the Secretary issued an order on reconsideration dismissing Koam's petition for reconsideration and upholding the Reparation Order.

9. Koam appealed the Reparation Order to the United States District Court Southern District of New York when it filed with the Court a Notice of Appeal and Petition on or about March 23, 2001.

10. DiMare is a corporation whose address is 258 N.W. 1st Avenue, Florida City, Florida 33034.

11. Petitioner is a corporation whose address is 238 NYC Terminal Market, Bronx, New York 10474.

12. At the time of the transactions that are at issue in this case, both Petitioner

and Respondent were licensed under the Act.

## TRANSACTIONS BETWEEN KOAM AND DiMARE

13. On March 16, 1999, under DiMare invoice number 1316, DiMare shipped to Koam 1600 boxes of DiMare brand 5x6 tomatoes at a price of $7.85 per box plus $23.50 for temperature recorder or a total of $12,583.50 F.O.B.

14. The shipment arrived at Koam on March 18, 1999 and, at Koam's request, 2 federal inspections were conducted, K677992–0 and K678203–1. Subsequent to the inspections, DiMare granted to Koam an allowance of $.50 per box or $800.00 in total. Koam check number 19666 in the amount of $11,783.50 was paid to DiMare in full payment of DiMare invoice number 1316. Neither of the investigations were conducted by investigators charged with or connected with any wrong doing regarding the Hunts Point bribery investigation.

15. The transaction evidenced by DiMare invoice number 1316 was not included in DiMare's complaint against Koam.

16. On March 20, 1999, under DiMare invoice number 1383, DiMare shipped to Koam 1600 boxes of DiMare brand 5x6 count price of $7.85 per box plus $23.50 for recorder or a total $12,583.50.

17. The shipment arrived at Koam on March 22, 1999, and without inspection, DiMare granted to Koam an allowance of $1.00 per box or $1600.00 in total. Koam paid DiMare invoice number 1383 by check number 19735 in the amount of $10,983.50

18. The transaction evidenced by DiMare invoice number 1383 was not included in DiMare's complaint against Koam.

19. On March 27, 1999 under DiMare invoices 1578 and 90884, DiMare shipped to Koam 800 boxes of 5x6 at $5.85 per box and 160 boxes of plum tomatoes at $7.90 per box plus $23.50 for recorder for a total of $5,967.50 for the two invoices. The

shipment arrived at Koam on March 29, 1999. Koam paid DiMare invoices 1578 and 90884 by check number 19790 in the amount of $5,967.50. The transaction covered by DiMare invoices 1578 and 90884 are not the subject of DiMare's complaint against Koam.

20. On March 27, 1999 under DiMare invoice number 1678, DiMare shipped to Koam 800 boxes of 5x6 tomatoes at the price of $5.85 per box plus $23.50 for recorder for a total of $4703.50. There was no federal inspection of the shipment. Koam paid DiMare invoice number 1678 by check number 19870 in the amount of $4,703.50. The shipment covered by DiMare invoice number 1678 is not the subject of DiMare's complaint against Koam.

21. On April 5, 1999, under DiMare invoice numbers 1814 and 90943, DiMare shipped to Koam 800 boxes of 5x6 tomatoes at $7.85 per box and 320 boxes of plum tomatoes at $8.90 per box plus $23.50 recorder change for a total of $9,151.50

22. The shipment arrived on April 7, 1999 and no federal inspection was requested. DiMare granted a $1.00 per box adjustment for the 5x6 and plum tomatoes for a revised total $8,031.50. Koam paid DiMare invoices number 51814 and 90943 by check number 19949 in the amount of $8,031.50. The shipments covered by DiMare invoices 814 and 90943 were not included in DiMare's Complaint against Koam.

23. On April 9, 1999 under DiMare invoice numbers 1898 and 90989, DiMare shipped to Koam 800 boxes of 5x6 tomatoes at $6.85 per box and 800 boxes of plum tomatoes at $7.90 per box plus $23.50 for recorder charges for a total of $11,823.50.

24. The shipment arrived on April 12, 1999. No federal inspection was requested. DiMare granted to Koam a $.50 per

box allowance on the plum tomatoes for a revised total of the two invoices of $11,423.50. Koam paid DiMare invoice numbers 1898 and 90989 by check number 20016 in the amount of $11,423.50. The shipments covered by DiMare invoices 1898 and 90989 were not included in DiMare's complaint against Koam.

25. On April 12, 1999 under DiMare invoice numbers 1995 and 91008, DiMare shipped to Koam 800 boxes of 5x6 tomatoes at $6.85 per box and 800 boxes at $7.90 per box plus $23.50 reorder charges for a total of $11,823.50.

26. The shipment arrived on April 14, 1999. No federal inspection was requested. DiMare granted to Koam a $.50 per box reduction in the plum tomatoes for a revised total for the two invoices of $11,423.50. Koam paid DiMare invoices 1995 and 91008 by check number 20015 in the amount of $11,423.50. The shipment covered by DiMare invoices 1995 and 91008 are not the subject of DiMare's complaint against Koam.

27. Under DiMare's invoice number 2102 bearing a ship date of April 17, 1999 and shipped from loading point in Florida, on a truck to Koam at the Hunts Point Market in Bronx, New York, one truck lot consisting of 800 cartons of DiMare brand 5x6 in 25 pound cartons at $7.85 per carton, or $6,280.00, plus $23.50 for a temperature recorder, or a total of $6,303.50 f.o.b.

28. Under DiMare's invoice number 91077 bearing a ship date of April 17, 1999 and shipped from loading point in Florida on a truck to Koam at the Hunts Point in Bronx, New York, one truck lot consisting of 800 cartons of plum tomatoes in 25 pound cartons at $6.90 per carton, or a total of $5,520.00, f.o.b.

29. Following arrival of the 5x6 and plum tomatoes on April 19, 1999 referenced by DiMare's invoice numbers 2102 and 91077, Koam called for a federal inspection.

30. On April 20, 1999, at approximately 5:45 a.m., a federal inspection of the two lots of tomatoes was made, and a certificate number K–679517–3 was issued by the federal inspector Elias Malavet.

31. One of the bases for Koam's requesting an allowance was the damage reported in the federal inspection bearing USDA certificate number K–6795173, and DiMare agreed to an allowance being granted to Koam of $1.50 per carton on the 800 cartons of 5x6 tomatoes and $1.00 per carton on the 800 cartons of Plum tomatoes, or a total of $2,000.00 on the two lots of tomatoes referenced by DiMare's invoice numbers 2102 and 91077. Koam paid DiMare invoices 52102 and 91077 by check number 20085 in the amount of $9,823.50. The shipments covered by DiMare invoice number 52102 and 91077 are part of the subject matter of DiMare's complaint against Koam.

32. On April 19, 1999, under DiMare invoice numbers 2107 and 91105, DiMare shipped to Koam 800 boxes of 5x6 tomatoes at $7.85 per box and 800 boxes of plum tomatoes at $6.90 per box plus $23.50 recorder charges for a total of $11,823.50.

33. The shipment arrived on April 22, 1999 and Koam requested a federal inspection of 5x6 tomatoes only.

34. On April 22, 1999, at approximately 5:30 a.m., a federal inspection of the lot of 5x6 tomatoes was made, and a certificate number K–679880–5, was issued by federal inspector Elias Malavet.

35. One of the bases for Koam's requesting an allowance was the damage reported in the federal inspection bearing USDA certificate number K–679880–5, and DiMare agreed to an allowance being granted to Koam of $1.50 per carton, or $1,200.00 on the lot of 5x6 tomatoes referenced by DiMare's invoice number 2107.

36. The plum tomatoes were not inspected. DiMare agreed to an allowance of $1.00 per box for the plum tomatoes. The adjusted total for DiMare invoice numbers 2107 and 91105 is $9,823.50. Koam paid DiMare invoice numbers 2107 and 91105 with check number 20086 in the amount of $9,823.50.

37. The 5x6 tomatoes covered by Di-Mare invoice number 2107 are part of the subject matter of DiMare's complaint against Koam. The plum tomatoes covered by DiMare invoice number 91005 were not included in DiMare's complaint against Koam.

38. On April 24, 1999, under DiMare invoice numbers 2189 and 91185, DiMare shipped to Koam 800 boxes of 5x6 tomatoes at $8.85 per box and 800 boxes of plum tomatoes at $7.90 per box plus $23.50 for recorder charges for a total of $14,143.50.

39. Following arrival of the load on April 26, 1999 referenced by DiMare's invoice number 2189 and 91185, Koam called for a federal inspection. On April 27, 1999, at approximately 8:05 a.m., a federal inspection of the lots of tomatoes was made, and a certificate number K–680040–3, was issued by federal inspector Michael Tsamis.

40. One of the bases for Koam's requesting an allowance was the damage reported in the federal inspection bearing USDA certificate number K–680040–3 and DiMare agreed to an allowance being granted to Koam at $1.00 per carton, or $800.00 on the lot of 5x6 tomatoes referenced by DiMare's invoice number 2189. In addition, DiMare granted Koam a $1.00 per box allowance on the plum tomatoes invoiced under DiMare number 91185. The revised total for invoice numbers 2189 and 91185 was $11,823.50. Koam paid Di-Mare invoice numbers 2189 and 91185 by check number 20084 in the amount of $11,823.50.

41. The 5x6 tomatoes covered by Di-Mare invoice number 2189 are part of the subject matter of DiMare's complaint against Koam. The plum tomatoes covered by DiMare invoice number 91185 were not included in DiMare's complaint against Koam.

42. Under DiMare's invoice number 91197 and 2213, bearing a ship date of April 26, 1999 and shipped from loading point in Florida, on a truck to Koam at the Hunts Point Market in Bronx, New York, one truck lot consisting of 800 cartons of plum tomatoes in 25 pound cartons at $7.90 per carton, or $6,320.00, f.o.b. and 800 boxes of 5x6 tomatoes at $8.85 per box plus $23.50 for recorder charges for a total of $13,423.50.

43. Following arrival at the loads referenced by DiMare's invoice number 91197 and 2213, Koam called for a federal inspection of the plum tomatoes only. On April 28, 1999 at approximately 11:35 p.m., a federal inspection of the lot of plum tomatoes was made, and a certificate number K–680205–2, was issued by federal inspector Thomas Vincent.

44. One of the bases for Koam requesting an allowance was the damage reported in the federal inspection bearing USDA certificate number K–680205–2 and Di-Mare agreed to an allowance being granted to Koam of $1.00 per carton, or $800.00 on the lot of plum tomatoes, referenced by DiMare's invoice number 91197. The revised total for invoice numbers 91197 and 2313 was $12,623.50.

45. Koam paid DiMare invoice numbers 2213 and 91197 by check number 20155 in the amount of $12,623.50. The plum tomatoes subject to invoice number 91197 are part of the subject matter of DiMare's complaint against Koam. The shipment of 5x6 tomatoes under invoice number 2213 was not included in the Di-Mare complaint.

46. Marvin Friedman was an employee of Koam during the time period of the transactions which are the subject of Koam's Petition.

47. Marvin Friedman pled guilty to ten (10) felony counts of Bribery of a Public Official for making cash payments to a United States Department of Agriculture ("USDA") produce inspector in order to influence the outcome of the inspection of fresh fruit and vegetables conducted at Koam.

48. Koam reimbursed Marvin Friedman for the legal fees, special assessment and fine he incurred in connection with his criminal conviction.

49. The ten counts that Marvin Friedman pled guilty to occurred on specific dates beginning April 6, 1999 through July 1, 1999.

50. None of the ten counts that Marvin Friedman pled guilty to include the produce transactions between DiMare and Koam that are the subject of reparation proceedings now on appeal before this Court.

51. Koam was invoiced directly by DiMare for the tomatoes which are the subject of Koam's Petition.

52. Koam remitted payment directly to DiMare on the invoices which Koam received from DiMare for the tomatoes which are the subject of Koam's Petition and the additional transactions described herein.

53. Koam paid for the tomatoes which are the subject of Koam's Petition by checks drawn from Koam's checking account.

54. The proceeds from Koam's sale of the tomatoes which are the subject of Koam's Petition were deposited in an account held in the name of Koam.

55. As part of his job duties, Marvin Friedman had the discretion, along with others, to request a USDA inspection of produce on behalf of Koam.

56. As part of his job duties, Marvin Friedman communicated directly with customers of Koam.

57. Elias Malavet, Michael Tsamis and Thomas C. Vincent are the USDA inspectors who are identified as the inspectors on the inspection certificates for the tomato invoice adjustments that are the subject of Koam's petition.

58. Elias Malavet, Michael Tsamis and Thomas C. Vincent pled guilty to multiple felony counts of Bribery of a Public Official for receiving cash payments beginning January 20, 1999 through July 9, 1999 from employees and owners of produce companies at the Hunts Point Terminal Market in return for being influenced in the performance of inspections of fresh fruits and vegetables.

59. None of the counts that Elias Malavet, Michael Tsamis and/or Thomas C. Vincent pled guilty to include the produce transactions between DiMare and Koam that are the subject of the reparation proceeding now on appeal before this Court.

60. The transactions that are the subject of Koam's Petition, as well as the other transactions described herein, were not inspected by a private surveyor nor was a United States Department of Agriculture supervisory appeal inspection requested by either DiMare or Koam.

### Discussion

It is common ground between the parties, and established law under the Uniform Commercial Code, that when a buyer accepts the goods but claims adjustments for defects, the buyer has the burden of establishing the defects (N.Y. Uniform Commercial Code § 2–607(4): "The burden is on the buyer to establish any breach with respect to the goods accepted.").

Koam attempts to carry that burden by (1) pointing to other sales on which DiMare granted discounts, (2) its own employees' statements that there were defects in the tomatoes involved in this claim, (3) its argument that the particular inspections involved in this claim were not shown to be fraudulent, and (4) its argument that the bribery of inspectors by its employee Friedman is not chargeable to Koam.

### 1. Inferences from Other Sales

■ From seven earlier sales on which DiMare granted Koam price reductions (Uncontested Facts ¶¶ 13–26) on which DiMare makes no claim for damages, Koam argues that one should infer that there were pervasive defects in DiMare's shipments of tomatoes.

I decline to adopt that speculation. In the individual negotiating environment in which the sales took place, without established daily market prices, it is just as likely that DiMare granted the discounts to obtain the good will of this new customer, or in simple bargaining to consummate a sale, as that the discounts reflected genuine product defects. Koam offers no evidence respecting those sales to support its speculation, and I accept Paul DiMare's explanation of the discounts as unrelated to defects, granted to accommodate a new purchaser with whom DiMare soon ceased doing business.

### 2. Statements by Koam Employees

■ Koam submits affidavits by two of its employees, Doo W. Lee and Max Lee, each of whom states that he personally inspected the produce in sales involved in this case. Each Lee states that he found the contents were damaged and not in acceptable condition (Doo Lee ¶ 3: "very soft texture and green in color"; Max Lee

¶ 3: "softness, over ripe condition and poor quality.")

Each of those affidavits contains the identical statement "At no time did I or any other employee of Koam pay any money or take an action for the purpose of creating a fraudulent inspection." It is clear that those statements about any other employee of Koam are false. They are flatly contradicted by Friedman's sworn confession during his guilty plea (*U.S. v. Friedman* (99 Cr. 1095) Feb. 25, 2000 Transcript, p. 7):

> THE DEFENDANT: On approximately the dates stated in the indictment, I paid cash to an inspector of the United States Department of Agriculture. The purpose of the payments was to influence the outcome of the inspection of fresh fruit and produce conducted at KOAM Produce Inc. located in the Bronx. I was an employee of KOAM at the time. I acted knowingly and intentionally and I knew that the payments were unlawful.
>
> *       *       *       *       *       *
>
> THE COURT: Where did you make these payments to the inspector for the Department of Agriculture?
> THE DEFENDANT: At KOAM Produce in the Bronx.

The Lee witnesses swore [1] to their affidavits on October 10, 2000, almost eight months after their co-employee Friedman's guilty plea. If they knew of his guilt, their affidavits were perjury. Even if they did not know Friedman had bribed inspectors, they must have known they had no basis for swearing that no employee of Koam had done so. Their willingness to make that broad statement under oath, when at the very least they were unaware whether it was true or false, bespeaks a willingness to testify to whatever

---

1. Their affidavits were sworn to before Koam's attorney in this case, who notarized them. He must have known of Friedman's guilty plea.

they see as their employer's interest. It creates distrust of their statements concerning the condition of the tomatoes. Accordingly, I do not credit those statements.

■ As justifying an inference that the tomatoes had defects, Koam tenders the certificate of its president and joint (with his wife) owner Jung Yong Park, who states that the tomatoes Koam purchased from DiMare were later sold at a loss. Once again, the suggested inference (that the losses were due to inferior quality) is no more probable than other speculations: poor salesmanship, market conditions, supply and demand, timing of sales, or the host of other factors that affect market price and performance. Accordingly I decline to draw the suggested inference. It is, in any event, undermined by the testimony of Hope Sanchez (Dep. pp. 40–44) that none of the other purchasers of the same lots of tomatoes as were purchased by Koam sought inspections of them, the evidence that there were few if any complaints from other purchasers, and the testimony of the state inspector in Florida that when packed the tomatoes were in conformity with federal standards of quality and condition. (Sneckenberg Dep. Ex's 3 and 5, part of DiMare Ex. 6).

The direct and indirect evidence tendered to show defects in the product sold to Koam by DiMare fails to carry that burden.

3. Argument that These Inspections Were Not Shown to be Affected by the Bribes

■ Drawing support from concessions by DiMare in paragraphs 50 and 59 of the Uncontested Facts that none of the counts

to which Friedman or the inspectors pled guilty specified the particular inspections of DiMare tomatoes involved in this case, Koam repeatedly asserts that "... there was no showing that the inspections in question were falsified" (Koam Trial Memorandum, p. 11) and points to the Judicial Officer's statement that "There is no showing on this record that falsified inspections were issued as to the specific lots of tomatoes listed" (*id.* p. 12 quoting Decision, p. 7). The assertion is reiterated throughout Koam's submissions, that these particular inspections (although performed by bribed inspectors) are not shown to be corrupt. That argument, if accepted, offers Koam an escape from the consequences of the bribery, and the prospect of rehabilitating the inspection certificates as evidence of defective produce.

But that argument fails on the evidence. *First,* as Friedman stated in his plea allocution (quoted at pp. 14–15 above) the "purpose of the payments was to influence the outcome of the inspection of fresh fruit and produce conducted at KOAM Produce Inc. located in the Bronx." *Second,* in its letter of June 23, 2000 to DiMare, the USDA stated that its Office of the Inspector General

... has recently forwarded inspection certificates to us that it says directly correspond to bribes that were offered and accepted. We are making copies of these certificates available to you, the party identified on the certificate as the shipper.

—and suggested that if any price adjustments had been granted, DiMare might wish to file a claim (*see* DiMare Ex. 1C, No. 5).[2] Thus, although the indictments

---

**2.** The statement that the inspection certificates "directly correspond to bribes" facially presents several levels of hearsay. That is immaterial. The exhibit was offered and admitted on consent, without reservation. F.R. Evid. 803(8) excepts from the hearsay rule

"factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trust-worthiness."

and pleas did not specify the inspections, the Inspector General identified inspection certificates that "directly correspond to bribes that were offered and accepted."

*Third*, the Official Report of the Hunts Point Bribery Incident lends confirmation to the conclusion that the bribed inspectors concentrated towards inspections for those who had bribed them:

> The night shift supervisor facilitated the scheme by matching up inspectors who were taking bribes with wholesale receivers who were paying them. The night shift supervisor received a $100 weekly 'kickback' from each of the corrupt inspectors.

(Report and Analysis of the Hunts Point Bribery Incident, p. 2.)

*Fourth*, it appears that the highest discount Koam obtained from DiMare on the shipments before the corrupt inspections was $1 per unit while on those thereafter, which were inspected by bribed inspectors, there was no discount of less than $1, and some were $1.50. (See ¶¶ 13–45 of the Uncontested Facts).

Taken as a whole, the evidence makes it more probable than not, and I find, that the inspections of which DiMare complains in this proceeding were performed by bribed inspectors, who falsified their results.

### 4. Koam's Liability for the Bribery

█ Koam argues that it was Friedman, not his employer Koam, who bribed the inspectors, and that Koam is without responsibility for his actions. Acceptance of that proposition would fly in the face of the evidence, of statute and common law, and of common sense.

When Friedman made his payments to the inspectors, he was an employee of Koam, handling purchases and sales in Koam's vegetable department (Friedman Plea tr., p. 17; Produce Reporter Blue Book, DiMare Ex. 14, p. 522). The purpose of his payments was to influence the outcome of the inspection of fresh fruit and produce conducted at Koam in the Bronx (Friedman Plea tr., p. 17). Friedman told Park, one of the owners of Koam, that the payments were "part of doing business in the Hunts Point Market" (Park Certificate, ¶ 27), a statement which was evidently accepted by Park. Koam not only paid for Friedman's legal representation in his criminal case, but also reimbursed his fine and special assessment upon his conviction. (Uncontested Facts, ¶ 48).

I find that Friedman's bribes were paid in the course of his employment, for the benefit of Koam, and were ratified by Koam.

Section 499p of PACA provides:

**§ 499p. Liability of licensees for acts and omissions of agents**

In construing and enforcing the provisions of this chapter, the act, omission, or failure of any agent, officer, or other person acting for or employed by any commission merchant, dealer, or broker, within the scope of his employment or office, shall in every case be deemed the act, omission, or failure of such commission merchant, dealer, or broker as that of such agent, officer, or other person.

█ The common law is to the same effect. *See Riviello v. Waldron*, 47 N.Y.2d 297, 418 N.Y.S.2d 300, 302, 391 N.E.2d 1278 (Ct.App.1979) ("Respondeat superior renders a master vicariously liable for a tort committed by his servant while acting within the scope of his employment."). Acts are within the scope of employment if they "in some way further the interests of the employer, and not solely benefit the employee." *In re Ivan F. Boesky Sec. Litig.*, 36 F.3d 255, 265 (2d Cir.1994).

█ Corporations can only act through their officers and employees, and in a proper case the acts and knowledge of the

employee are imputed to the corporation. For the reasons set forth above, this is such a case.

### Law

■■ Koam fares no better under the law. DiMare can recover the adjustments it granted to Koam in reliance on official certificates, not knowing that Koam had bribed the inspectors to falsify them. A mutual mistake of the parties, or (as here) a mistake on plaintiff's part and a fraud by defendant "are the classic grounds for reformation of an instrument in equity." *Brandwein v. Provident Mutual Life Ins. Co.*, 3 N.Y.2d 491, 496, 146 N.E.2d 693, 695, 168 N.Y.S.2d 964, 967 (Ct.App.1957).

■ On the same principle, the Restatement (Second) Contracts § 153 provides:

**When Mistake of One Party Makes a Contract Voidable**

Where a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances that is adverse to him, the contract is voidable by him if he does not bear the risk of the mistake under the rule stated in § 154, and

(a) the effect of the mistake is such that enforcement of the contract would be unconscionable, or

(b) the other party had reason to know of the mistake or his fault caused the mistake.

Here, all the conditions are met. DiMare does not bear the risk of mistake under § 154 (because the risk was not allocated to it by agreement of the parties, there was no occasion to contemplate the risk of bribery, and it would be unreasonable to allocate that risk to DiMare), it is obvious that Koam's fault caused the mistake, and enforcement of the discounts would be unconscionable.

### Conclusion

Judgment on the merits will be entered in favor of DiMare, dismissing Koam's petition and awarding DiMare the sum of $4800 together with costs, interest and, under 7 U.S.C. § 499g(c), attorneys' fees.

A conference will be held on August 9, 2002 at 12 o'clock noon to address any remaining issues.

So ordered.