**B.T. PRODUCE CO., INC., Petitioner,**

*v.*

**ROBERT A. JOHNSON SALES, INC., Respondent.**

**No. 03 CIV. 5634VM.**

United States District Court, S.D. New York.

Dec. 14, 2004.

Mark Charles Hewitt Mandell, Annandale, NJ, for Petitioner.

Leonard A. Rodes, Trachtenberg, Rodes & Friedberg, L.L.P., New York City, for Respondent.

### DECISION AND ORDER

MARRERO, District Judge.

Petitioner B.T. Produce Co., Inc. ("BTP") has appealed a June 30, 2003 reparation order (hereinafter, "Reparation Order") rendered by a Judicial Officer of the United States Department of Agriculture ("USDA") in favor of respondent Robert A. Johnson Sales, Inc. ("RAJS"), awarding RAJS $34,171.75 plus interest and costs. Under Section 499g(c) of the Perishable Agricultural Commodities Act ("PACA"), 7 U.S.C. § 499a *et seq.*, such an appeal is reviewed *de novo* by a federal district court, "except that the findings of fact and order or orders of the Secretary shall be *prima-facie* evidence of the facts therein

stated." 7 U.S.C. § 499g(c). BTP's appeal was filed with this Court on July 30, 2003.

RAJS has now moved for summary judgment on the appeal pursuant to Fed. R.Civ.P. 56.[1] The Court grants RAJS's motion, concluding that BTP has failed to produce any evidence that reasonably calls into question the validity of the Reparation Order.

## I.  BACKGROUND

### A.  BTP'S INVOLVEMENT IN COR-RUPTION AT HUNTS POINT PRO-DUCE MARKET

The reparations proceeding that is the subject of the instant motion is one of many that arose out of corrupt practices at the Hunts Point Wholesale Produce Market in the Bronx, New York. *See Koam Produce, Inc. v. DiMare Homestead, Inc.*, 213 F.Supp.2d 314 (S.D.N.Y.2002) (hereinafter, *"Koam I"*) (affirming PACA reparation award arising out of corrupt practices at Hunts Point); *Koam Produce, Inc. v. Dimare Homestead, Inc.* 222 F.Supp.2d 399 (S.D.N.Y.2002) (hereinafter, *"Koam II"*) (awarding attorney's fees to prevailing party in reparation proceeding under PACA), *aff'd*, 329 F.3d 123 (hereinafter, *"Koam III"*) (affirming *Koam I* and *Koam II*). As uncovered by federal investigators and as discussed in *Koam I*, 213 F.Supp.2d at 317–18, produce wholesalers operating out of the Hunts Point Market would regularly pay small bribes to USDA inspectors and supervisors, who in exchange for the bribes would artificially downgrade produce in official inspections requested by the wholesalers. The wholesalers would then be able to use the fraudulent inspections as leverage with produce suppliers to negotiate a reduction in the price paid by the wholesalers to the suppliers, who were not present during the inspections and who had no reasonable means of calling the inspections' results into question. This conduct occurred from at least the beginning of 1996, when the federal government began an investigation it called "Operation Forbidden Fruit," through October 27, 1999, when twenty-one people, including eight USDA inspectors and thirteen owners and employees of produce wholesalers were arrested for their roles in the bribery scheme. *See id.;* United States Department of Agriculture, *Report and Analysis of the Hunts Point Bribery Incident* (hereinafter, "USDA Report"), attached as Ex. C to RAJS's Request for Court to Take Judicial Notice of Matters in Support of RAJS's Motion for Summary Judgment, dated Aug. 31, 2004 (hereinafter, "RAJS Request for Judicial Notice").[2]

Though this point is disputed by BTP in its pleadings and two brief affidavits submitted on its behalf, numerous documents indicate that an employee and part-owner of BTP, William Taubenfeld ("Taubenfeld"), had paid bribes and received benefits under the illicit arrangement from at least 1996 until he was arrested and indicted on October 27, 1999.[3] Although Tau-

---

1. The parties have also moved for the Court to take judicial notice of several documents relevant to this appeal. For reasons discussed *infra*, the Court grants these motions.

2. The Court grants RAJS's request to take judicial notice of the USDA Report, which was made without opposition from BTP. Courts have frequently taken judicial notice of official government reports as being "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," Fed.R.Evid. 201(b). *See, e.g., Texas & Pac. Ry. Co. v. Pottorff*, 291 U.S. 245, 254 n. 4, 54 S.Ct. 416, 78 L.Ed. 777 (1934), *amended on other grounds*, 291 U.S. 649, 54 S.Ct. 525, 78 L.Ed. 777 (1934) (taking judicial notice of official reports put forth by the Comptroller of the Currency); *Kaggen v. I.R.S.*, 71 F.3d 1018, 1021 (2d Cir.1995).

3. The Court also grants RAJS's and BTP's requests to take judicial notice of various documents from a criminal case brought by the

benfeld's indictment only charged him with thirteen bribes of USDA inspectors between March and August of 1999, *see* Indictment, *United States v. Taubenfeld,* 99 Cr. 1094 (S.D.N.Y. Oct. 27, 1999), attached as Ex. A to Plaintiff–Appellant's Request for the Court to Take Judicial Notice, dated Sept. 30, 2004 (hereinafter, "BTP Request for Judicial Notice"), his Plea Agreement permitted him to plead guilty to only one count of bribery in exchange for a promise from the Government that he would not "be further prosecuted criminally ... for his participation, *from in or about 1996* through in or about October 27, 1999, in making cash payments to United States Department of Agriculture produce inspectors in connection with inspections of fresh fruit and vegetables at B.T. Produce Co., Inc." Plea Agreement at 2, *United States v. Taubenfeld,* 99 Cr. 1094 (S.D.N.Y. Feb. 2, 2000) (hereinafter, "Taubenfeld Plea Agreement"), attached as Ex. A to RAJS Request for Judicial Notice (emphasis added).[4] Furthermore, in Taubenfeld's sentencing hearing, neither Taubenfeld nor his attorney objected when Judge Cote of this Court described Taubenfeld's illegal conduct as occurring between January 1996 and October 1999, and asked if there

were any remaining factual issues in dispute related to the Government's case against Taubenfeld. *See* Transcript at 3–4, *United States v. Taubenfeld,* 99 Cr. 1094 (S.D.N.Y. May 11, 2000) (hereinafter, "Taubenfeld Sentencing Hearing"), attached as Ex. B to RAJS Request for Judicial Notice.[5] BTP nonetheless insists that there is no evidence that Taubenfeld bribed any USDA inspectors on its behalf before the fall of 1998, at the earliest. (*See* BTP's Memorandum of Law in Opposition to Motion for Summary Judgment (hereinafter, "BTP Mem. of Law") at 3–4.) In support of its assertions, BTP puts forth two declarations by USDA inspectors who pled guilty to taking bribes and preparing fraudulent inspections as part of the corrupt practices at the Hunts Point Market, and who claim that Taubenfeld had not begun bribing them or other inspectors until the later half of 1998, at the earliest. (*See* Declaration of Michael Tsamis, dated Sept. 25, 2004 (hereinafter, "Tsamis Decl."), attached to Plaintiff–Appellant's Counter–Statement of Contested Material Facts (hereinafter, "BTP Rule 56.1 Statement"), ¶ 3 ("I did, occasionally receive $50.00 payments from Billy Taubenfeld in 1999, but I have no recollection

United States against Taubenfeld. *See United States v. Taubenfeld,* 99 Cr. 1094(DLC) (S.D.N.Y. filed Oct. 27, 1999). The parties did not object to each others' requests, and the documents the parties are seeking to introduce—Taubenfeld's indictment, his plea agreement with the Government, and the transcript of his sentencing hearing, are subject to judicial notice pursuant to Fed.R.Evid. 201(b). *See, e.g., Jacques v. R.R. Retirement Bd.,* 736 F.2d 34, 40 (2d Cir.1984)(taking judicial notice of complaint in inferior court within same jurisdiction in related case); *Allen v. City of Yonkers,* 803 F.Supp. 679, 697 n. 22 (S.D.N.Y.1992)(taking judicial notice of prior action in this District involving some of the same parties).

4. The Plea Agreement was also part of the official USDA record that served as the basis

for the Reparation Order. *See* Certified Copy of PACA Docket No. R–01–033 at 5.

5. Judge Cote's description of Taubenfeld's involvement in the fraudulent scheme appears to be based at least in part on the Presentence Investigation Report that the Probation Department prepared to aid in Judge Cote's sentencing of Taubenfeld. *See* Presentence Investigation Report, *United States v. Taubenfeld,* 99 Cr. 1094 (S.D.N.Y. Apr. 28, 2000) (hereinafter, "Taubenfeld PSR"). In that Report, to which Taubenfeld had no substantive objections, *see id.* at 25, Taubenfeld is described as having bribed a cooperating witness "for many years," *id.* at 9, and as having paid corrupt inspectors regular bribes from at least January 1996 through the date of his arrest in 1999, *see id.* at 12.

of receiving such payments from anyone at BT Produce prior to late 1998."); Declaration of Glenn Jones, dated Sept. 24, 2004 (hereinafter, "Jones Decl."), attached to BTP Rule 56.1 Statement, ¶ 4 ("I was personally aware when Billy Taubenfeld, a salesman at B.T. Produce . . ., first began making payments to inspectors when they were present at that wholesaler to perform inspections on produce shipments. Such payments did not begin until the later half of 1998.").)

## B. *THE DISPUTE BETWEEN THE PARTIES*

In 1996 and 1997, RAJS, a California supplier of grapes, sold several shipments of grapes to BTP at the Hunts Point Market that had been inspected by USDA inspectors and found below grade. On the basis of these inspections, RAJS had agreed to reduce the prices it would otherwise have charged BTP for the shipped grapes. Upon learning of the corrupt practices at the Hunts Point Market during that period of time, RAJS filed a PACA reparation claim against BTP on March 24, 2000, seeking reimbursement for the amount by which ten separate shipments of grapes to BTP during 1996 and 1997 were devalued as a result of allegedly fraudulent inspections.[6] BTP filed counterclaims related to the ten shipments, alleging that it was fraudulently induced to overpay for the shipments by more than $100,000.

The resulting Reparation Order denied RAJS's claims as to five of the shipments and BTP's counterclaims in their entirety, but granted reparations against BTP for the five other devalued shipments. The Reparation Order first acknowledged that

there was no explicit evidence on the record that any of the inspections of the ten challenged shipments were fraudulent. It further noted that five of the ten challenged shipments were inspected by USDA employees who were not implicated in the bribery scheme. The Reparation Order thus denied RAJS's reparation claims related to those five shipments, concluding that RAJS could not demonstrate that the inspections were tainted by bribes. *See* Reparation Order at 13. The other five inspections, however, were undertaken by USDA inspectors who were charged and convicted of accepting bribes from wholesalers. The Reparation Order determined that these inspections were procured by Taubenfeld acting as an agent for BTP, and that Taubenfeld's actions could thus be charged to BTP. *See id.* at 21. Because the inspections were procured by an individual who had admitted to committing bribes during the period at issue, and conducted by USDA inspectors who had been found to have accepted bribes during that same period, the Reparations Order concluded that the allowances or downward price adjustments that RAJS had agreed to accept as a result of the five corrupt inspections could be set aside on the grounds of misrepresentation or unilateral mistake. *See id.* at 24. It denied BTP's counterclaims on the grounds that they were time-barred under PACA's nine-month statute of limitations and were not supported by evidence that the parties had reached an accord and satisfaction on the shipments that served as the basis for its counterclaims. *Id.* at 18–19.

Since BTP had no evidence independent of the allegedly fraudulent inspection cer-

---

6. RAJS's PACA claims were not time-barred, despite a nine-month statute of limitations normally applying to such claims, *see* 7 U.S.C. § 499f(a)(1), because Congress explicitly extended the deadline for filing PACA reparation claims "involving the allegation of a false inspection certificate prepared by a grader of the Department of Agriculture at the Hunts Point Terminal Market" until January 1, 2001. Grain Standards and Warehouse Improvement Act of 2000, Pub.L. No. 106–472, § 309, 114 Stat.2058, 2075.

tificates to support its claims that RAJS's produce was damaged at the time it was accepted, the Reparations Order required BTP to pay damages to RAJS reflecting the amount by which the produce was devalued as a result of the inspections. For three of the shipments, designated as Shipments 3, 7, and 8 in the Reparation Order, damages were calculated as the difference between the contract price BTP had originally agreed to pay RAJS and the amount it ultimately paid after RAJS agreed to make adjustments as a result of the inspections. Those damages totaled $18,120.00. The other two shipments, designated as Shipments 9 and 10 in the Reparations Order, were sold on what was known as an "open" basis, with the prices of the shipments to be negotiated upon their arrival at the Hunts Point Market. *Id.* at 14–15. Based on published prices at the market for various grades of grapes on the days Shipments 9 and 10 arrived at the Hunts Point Market, the Reparations Order concluded that RAJS received $16,051.75 less than it would have had the inspections not downgraded the grapes. It thus ordered BTP to pay RAJS this amount in damages as well, for a total of $34,171.75 in damages, plus interest in the amount of 10 percent per annum from January 1, 1998 until paid, plus $300.00 in costs.

This appeal followed.

## II. DISCUSSION

### A. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides for summary judgment when the materials offered in support of the motion "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Court ascertains which facts

are material by considering the substantive law of the action, for only those "facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Normally, a moving party who bears the ultimate burden of proof at trial must "support" its motion for summary judgment by "informing the district court of the basis for its motion," and by identifying portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In this case, however, BTP, the nonmoving party, bears an initial burden of production at trial to call into question the *prima facie* validity of the Reparation Order. This burden of production is placed on BTP by 7 U.S.C. § 499g(c), which states that reparation orders must be treated as "*prima-facie* evidence of the facts therein stated." *See Frito–Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1032 (D.C.Cir.1988); *Frankie Boy Produce Corp. v. Sun Pacific Enterprises*, No. 99 Civ. 10158(DLC), 2000 WL 991507 at *1 (S.D.N.Y. July 19, 2000).

*Frito Lay* establishes that BTP must make an affirmative showing that there is a genuine issue for trial in order to defeat RAJS's motion for summary judgment. As in *Frito–Lay*, the appellee, RAJS, faces the burden of proving its right to recover under PACA. Also as in *Frito–Lay*, the appellee (RAJS) discharged its initial burden as moving party under *Celotex* "when, armed with the *prima facie* value of the Secretary's decision, [RAJS] alerted the Court to the absence of evidence to support appellant's case." *Frito–Lay*, 863 F.2d at 1033.[7] As the appellant was re-

---

7. Other than the documents related to Tau-

benfeld and Operation Forbidden Fruit judi-

quired to do in *Frito–Lay*, BTP must in this case "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* (quoting *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548) (internal quotation marks omitted).

## B. *BTP HAS FAILED TO MEET ITS BURDEN OF PRODUCTION*

The Court concludes that BTP has failed to introduce any evidence that legitimately calls into question the Reparation Order's *prima facie* validity. For BTP to succeed in establishing that there is a "genuine issue for trial," *id.*, it must demonstrate that there is some means of distinguishing RAJS's claims from those of the produce supplier in *Koam.* In that case, a produce supplier who agreed to accept downward price adjustments from wholesalers at the Hunts Point Market as a result of negative USDA inspections filed a PACA reparation claim against the wholesaler, seeking damages associated with those downward adjustments. The inspections were conducted by USDA inspectors who admitted to taking bribes during that period of time, and were requested by an employee of the wholesaler who had admitted to paying bribes during that time. The PACA reparation order in that case found no evidence that the specific inspections giving rise to the downward adjustments were fraudulent, but nonetheless ordered the wholesaler to pay reparations. The District Court affirmed the reparation order over the objection of the wholesaler, who argued that the supplier needed to offer evidence that each of the challenged inspections were actually fraudulent.

The Court of Appeals rejected that argument, concluding that the wholesaler's price adjustment agreements could be voided under the doctrine of unilateral mistake even without evidence that the specific inspections were fraudulent. Under the doctrine:

> Where a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances that is adverse to him, the contract is voidable by him if he does not bear the risk of the mistake …, and
>
> (a) the effect of the mistake is such that enforcement of the contract would be unconscionable, or
>
> (b) the other party had reason to know of the mistake or his fault caused the mistake.

*Koam III*, 329 F.3d at 127 (quoting *Restatement (Second) of Contracts* § 153). The Circuit Court found that the supplier's lack of knowledge concerning the wholesaler's and inspectors' involvement in a bribery scheme at the time the adjustments were made led the supplier to be mistaken concerning the validity of the USDA inspections: "It is clear that, when the parties agreed to the price adjustments, DiMare [the supplier] was mistaken as to both whether Koam [the wholesaler] had paid bribes to USDA inspectors to influence the outcome of inspections and whether the USDA inspectors who examined the tomatoes had accepted bribes." *Id.* It was equally clear to the Circuit Court that the mistakes were material and adverse to the supplier, that the supplier did not bear the risk of mistake, and that the mistake was the fault of the wholesaler's failure to disclose its own involvement in bribery activities. *Id.* at 127–28. The Circuit Court also held that the adjustments were voidable on the grounds that it would be unconscionable to enforce the

---

cially noticed *infra,* RAJS is has introduced no evidence other than the Reparation Order

in support of its Motion for Summary Judgment.

agreements, "which resulted from the work of inspectors who had accepted bribes." *Id.* at 128.

The Reparation Order in this case was based on the same legal doctrine adopted by the Circuit Court in *Koam III*, as well as on the doctrine of misrepresentation. *See* Reparation Order at 19–24. As approved of by the Circuit Court in *Koam III*, the Reparation Order granted relief under these doctrines where a downward price adjustment was requested by an employee of a produce wholesaler, Taubenfeld, who was convicted of bribing public officials, based on an inspection conducted by an inspector who was convicted of taking bribes. BTP does not take issue with the Reparation Order's legal analysis, but instead argues that this case can be distinguished from *Koam* on the grounds that its employee, Taubenfeld, did not begin to engage in illegal activity until after the inspections at issue in this case were already completed.[8] The only evidence that it has introduced in this Court in support of this argument, however, are two declarations by USDA inspectors who pled guilty to accepting bribes from produce wholesalers. These declarations, as described above, briefly assert that Taubenfeld did not begin bribing USDA inspectors until late 1998. They are accompanied by conclusory allegations in BTP's brief that Taubenfeld did not begin making illegal payments until 1998, at the earliest. *See* BTP Mem. of Law at 2 ("There was no evidence introduced in the USDA proceeding that Billy Taubenfeld (or anyone else at BT) made any illegal payments to any inspector prior to the earliest criminal charge relating to March 24, 1999.");[9]

*id.* at 4 ("The Secretary would be likewise justified in voiding agreements between the Fall of 1998, *when it can now be established that Taubenfeld began his illegal payments,* and October 27, 1999 when he was arrested and ceased his connection with BT.")

The Court concludes that the unsupported declarations of the two inspectors are insufficient in several respects to call into question the Reparation Order. First, the supplier in *Koam* was allowed to void downward price adjustments on the grounds that it would be unconscionable to enforce adjustments "which resulted from the work of inspectors who had accepted bribes" where the company benefiting from the adjustments had engaged in, and profited from, illegal bribery, *Koam III*, 329 F.3d at 128, as well as on the basis of the produce wholesaler's failure to inform the supplier of the ongoing corrupt activities at the market. It would be similarly unconscionable to enforce RAJS's adjustments in this case. BTP does not dispute that the inspections of Shipments 3, 7, 8, 9 & 10 "resulted from the work of inspectors who had accepted bribes" in exchange for downgrading produce at the time they inspected RAJS's shipments, nor does it deny awareness of the corrupt practices pervading the Hunts' Point Market at the time the adjustments were made, or dispute that it benefited financially from corruption at the market. Furthermore, if RAJS had known of the widespread corruption at the market, it may have decided to discount the USDA inspections or seek independent inspections, rather than simply accept price adjustments on the basis

---

**8.** BTP does not dispute that the inspectors whose reports prompted RAJS to accept downward price adjustments were accepting bribes at the time of the inspections.

**9.** This allegation is directly contradicted by evidence that the Plea Agreement, in which Taubenfeld admitted his bribery of USDA inspectors from "in or about 1996 through in or about October 27, 1999," was part of the official USDA record at the time the Reparation Order was issued. *See* Certified Copy of PACA Docket No. R–01–033 at 5.

of the inspections themselves. BTP deprived RAJS of those options when it failed to tell RAJS that the inspections it had ordered were inherently suspect. *See Restatement (Second) of Contracts* § 153.

Second, the declarations lack sufficient foundation to call into question the validity of Taubenfeld's own admission that he began bribing USDA inspectors beginning in 1996, at the latest. As discussed above, Taubenfeld acknowledged bribing inspectors from 1996 until 1999 on numerous occasions. *See* Taubenfeld Plea Agreement at 2 (Taubenfeld admitting "his participation, *from in or about 1996* through in or about October 27, 1999, in making cash payments to United States Department of Agriculture produce inspectors in connection with inspections of fresh fruit and vegetables at B.T. Produce Co., Inc."); Taubenfeld Sentencing Hearing (reiterating Taubenfeld's admission that he began bribing USDA officials in 1996); Taubenfeld PSR (same). Neither of the declarants, who do not profess to know Taubenfeld personally or to have spoken with him about when he began bribing officials, would be in a position to know better than Taubenfeld himself when Taubenfeld began paying bribes at the Hunts Point Market. None of BTP's pleadings attempts to explain why the convicted inspectors' speculative declarations should be credited where they are directly contradicted by Taubenfeld's admissions concerning matters uniquely within his own knowledge.[10] *See* Fed.R.Civ.P. 56(e) ("Supporting and opposing affidavits *shall be made on personal knowledge,* shall set forth facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated

therein.") (emphasis added); *Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d Cir.2004) (concluding that a party may not create a genuine issue for trial "merely by the presentation of assertions that are conclusory").

Third, the Court finds these declarations inherently contradictory and implausible. While the Court may not assess credibility on summary judgment, *see Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 619 (2d Cir.1996), "when evidence is so contradictory and fanciful that it cannot be believed by a reasonable person, it may be disregarded." *Jeffreys v. Rossi,* 275 F.Supp.2d 463, 476–77 (S.D.N.Y.2003). BTP has introduced no statements and made no arguments calling into question the validity of its own agent Taubenfeld's admissions, which may be charged to BTP, even though it had every opportunity to do so during the USDA reparations proceeding and this appeal. Not only are the declarations directly contradicted by its agent's admissions; at least one of the declarations is contradicted as well by the declarant's own statements during the criminal proceedings brought against him. While Michael Tsamis states in his declaration that none of his inspections were influenced by bribes (*see* Tsamis Decl. ¶ 4 ("[N]or were any of may inspections written up with any notations other than what resulted from my personally examining the produce and then following the training and procedures given me by the USDA Inspection Service")), he admitted during his plea hearing that he "accepted $150 for performing three inspections ... to downgrade the commodities that the applicant was getting and give adjustments in the price." Transcript at 38, *United States v.*

---

10. Declarant Glenn Jones alleges that "[i]n my position as both inspector and supervisor in the Hunts Point Market, I had first hand personal knowledge of all of the people in that market who did, and those who did not make payments to USDA inspectors." (Jones

Decl. ¶ 3.) But Jones, even if he was a self-styled leader of a corrupt enterprise, was in no position to know whether or when Taubenfeld may have paid bribes to USDA inspectors who, in turn, failed to report those bribes to him.

*Tsamis,* 99 Cr. 1085(LAK) (S.D.N.Y. Feb. 9, 2000).[11] Permitting BTP to manufacture an issue for trial on the basis of conflicts between its own agent, Taubenfeld, and these declarants "would be a terrible waste of judicial resources and a fraud on the court." *Jeffreys,* 275 F.Supp.2d at 477.

BTP's other objections to RAJS's summary judgment motion lack merit. First, BTP asserts that the Court should adopt the approach of the District Court in *Six L's Packing Co., Inc. v. Post & Taback, Inc.,* Nos. 01 Civ. 0573, 01 Civ. 0934(JSR) (Consolidated) (S.D.N.Y. Apr. 29, 2002), attached as Ex. 3 to BTP's Request for Judicial Notice, in which the court approved a proposed settlement recommended by a Special Master for distribution of a limited PACA trust fund.[12] (*See* BTP Mem. of Law at 5.) In that case, the District Court was faced with multiple claimants to the limited assets of an insolvent wholesaler, many of whom were mere nonpayment creditors. The court also lacked the benefit of factual findings contained in USDA reparation orders because produce suppliers who alleged fraudulent downgrading were forced to file claims directly in District Court in order to have any opportunity to recover against the insolvent wholesaler. In addition, the parties had extremely limited opportunity to engage in discovery concerning the extent to which the wholesaler had engaged in bribery. *See* Revised Special Master's Report and Recommendation at 2–5 & 10, *Six L's Packing Co., Inc. v. Post & Taback, Inc.,* Nos. 01 Civ. 0573, 01 Civ. 0934(JSR) (Consolidated) (S.D.N.Y. Nov. 20, 2001), attached as Ex. 2 to BTP Request for Judicial Notice. None of these conditions obtain here: RAJS has brought a claim for damages directly against a solvent defendant; the Court has the benefit of the Reparation Report as a *prima facie* source of factual findings; and BTP had ample opportunity, both during the USDA reparation proceedings and in the *de novo* proceeding before the Court, to discover evidence that, despite Taubenfeld's admissions, BTP's business practices were not tainted by bribery before late 1998. Therefore, the approach taken by the District Court in the *Six L's* case does not apply here.

Next, BTP reasserts its counterclaims against RAJS, arguing that it overpaid by over $46,000 for Shipments 1, 2, 4, 5, and 6, as designated by the Reparation Order, which were performed by USDA inspectors who had never been accused of bribery. BTP bears the burden of proof on these claims, *see Koam III,* 329 F.3d at 128, but offers no evidence in support of its argument. Even if its claims were not barred by the PACA statute of limitations,[13] BTP cannot under *Celotex* resist

---

11. Declarant Jones stated in his plea allocution that he "received cash payments to downgrade produce," *id.* at 34, but unlike Tsamis, he does not purport in his declaration to have avoided being influenced by bribes when inspecting produce.

12. The Court takes judicial notice of the Special Master's Report and the Order approving the recommendations contained in the Report as accurately reflecting the District Court's disposition of the case.

13. BTP acknowledges that its counterclaims would otherwise be time-barred under PACA, but argues that it may nonetheless assert them under N.Y.C.P.L.R. § 203(d), which permits counterclaims to be asserted late if the "counterclaim arose from the transactions, occurrences, or series of transactions or occurrences, upon which a claim asserted in the complaint depends." The Court expresses serious reservations concerning the availability of this state procedural rule under PACA, which designated a strict time limitation for filing PACA reparation claims with a limited exception for those that had been harmed by bribery at Hunts Point Market, but does not reach this question, given BTP's failure to introduce any evidence in support of its counterclaims.

summary judgment where it has no evidence of overpayment that could create a genuine issue for trial. BTP is incorrect when it argues that it may rely solely on "the evidence submitted before the Secretary" without introducing or pointing to *any* record evidence in support of its counterclaims before this Court, either in its brief or in its Local Rule 56.1 Statement. Under PACA, the record before the Court on appeal consisted only of the Reparation Order and the pleadings filed before the USDA Secretary. *See* 7 U.S.C. § 499g(c); *Frito–Lay,* 863 F.2d at 1036. BTP has had ample opportunity to conduct discovery in this Court, or to seek to introduce discovery that may have been conducted during the reparation proceeding into evidence here. Since it has not done so, the Court concludes that RAJS is entitled to judgment as a matter of law on BTP's counterclaims.

BTP's arguments that a trial is necessary to determine whether damages were properly calculated for Shipments 9 and 10, which were sold on an "open" price. But, as with its counterclaims, BTP introduces absolutely no evidence suggesting that those shipments were properly priced, or that the damage calculations employed by the Reparation Order are incorrect. This wholly unsupported argument may be disregarded by the Court on summary judgment.

### III. *CONCLUSION*

For the reasons stated above, it is hereby

**ORDERED** that the Motion for Summary Judgment of respondent Robert A. Johnson Sales, Inc. ("RAJS") against petitioner B.T. Produce Co., Inc. ("BTP"), pursuant to Fed.R.Civ.P. 56 and Local Rule 56.1, is hereby granted; it is further

**ORDERED** that judgment be entered in favor of RAJS in the amount of $34,171.75, plus interest thereon at the rate of 10 percent per annum from January 1, 1998, plus $300, plus additional costs, expenses, and attorney's fees pursuant to 7 U.S.C. § 499g(c); and it is finally

**ORDERED** that RAJS submit its application for costs, expenses and attorney's fees to the Court by January 7, 2005, that BTP submit its response to RAJS's application by January 21, 2005, and that RAJS submit any reply to BTP's response by January 28, 2005.

The Clerk of Court is directed to close this case, subject to its being reopened in the event that the application for costs and fees authorized above is filed.

**SO ORDERED.**